Tsui Yuan TSENG, Plaintiff–Appellant–
Cross–Appellee,

v.

EL AL ISRAEL AIRLINES, LTD.,
Defendant–Appellee–Cross–
Appellant.

Nos. 331, 857, Dockets 96–7447, 96–7619.

United States Court of Appeals,
Second Circuit.

Argued Nov. 20, 1996.

Decided June 13, 1997.

As Amended Sept. 16, 1997.

**100**

Robert H. Silk, New York City (Silk, Bunks & Suckle, P.C., New York City, of counsel), for Plaintiff–Appellant.

Diane Westwood Wilson, New York City (Debra A. Shields, Condon & Forsyth, New York City, of counsel), for Defendant–Appellee.

Before: NEWMAN, Chief Judge, CARDAMONE and ALTIMARI, Circuit Judges.

1.
> So pass I hostel, hall, and grange;
> By bridge and ford, by park and pale,
> All-arm'd I ride, whate'er betide,
> Until I find the Holy Grail.

Alfred Lord Tennyson, *Sir Galahad, in* The Poetic and Dramatic Works of Alfred Lord

CARDAMONE, Circuit Judge:

We have two issues to resolve on this appeal. One relates to the meaning of the term "accident" under Article 17 of the Warsaw Convention. The second, and by far more elusive, is whether a plaintiff denied a remedy for alleged injuries under the Convention because it does not apply may then pursue a claim for the same injuries in state court. The Supreme Court has not answered this question, and our search for the correct answer is somewhat reminiscent of Sir Galahad's search for the "Holy Grail." But unlike that Crusader who, pressing on, left the plain and climbed the height,[1] we must toil in the valley, examining the Convention's language, its drafting history, decisional law and the thoughts of scholarly commentators.

Plaintiff Tsui Yuan Tseng (plaintiff or appellant) appeals from a judgment entered in the United States District Court for the Southern District of New York (Stanton, J.) that awarded her $1,034.90 for damages against defendant El Al Israel Airlines, Ltd. (El Al) for loss of her baggage, but dismissed her personal injury claim against the same defendant for failure to establish a cognizable injury.

Tseng alleged that El Al caused her to suffer personal injuries when it subjected her to a security search prior to her boarding an El Al flight from New York to Tel Aviv, Israel, and that the airline damaged and/or lost some of her personal belongings while searching her luggage. The district court ruled that the carrier's conduct constituted an "accident," giving rise to liability under Article 17 of the Warsaw Convention,[2] but that Tseng was barred from recovery because the only injuries she alleged were psychological and emotional, not physical.

## BACKGROUND

Tseng, a New York resident employed by Beth Israel Medical Center, went on May 22,

Tennyson 101, 101 (W.J. Rolfe ed., Cambridge ed. Houghton, Mifflin & Co. 1898).

2. Convention for Unification of Certain Rules Relating to International Transportation by Air, *concluded* Oct. 12, 1929, 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* 49 U.S.C. § 40105 note.

1993 to John F. Kennedy International Airport in New York where she was scheduled to take El Al Flight LY–008 to Tel Aviv. Upon arrival, she proceeded to El Al's terminal, presented her ticket and U.S. passport to an El Al security guard, entered the terminal building and proceeded to a security area, where she was asked routine questions regarding her destination. Based upon her responses, which the security guard considered illogical—no explanation of why they were considered so is in the record—Tseng was classified as a "high risk" passenger.

Pursuant to the airline's security procedures, plaintiff was taken to a private room where she was subjected to a security search for explosives or detonating devices. The term "security search" refers to an intrusive search of a passenger's body initiated after a routine check by metal detector and questioning have led airline personnel to deem a passenger a security risk. Tseng was told to remove her shoes, jacket and sweater, and then instructed to lower her blue jeans to mid-hip level. A female security guard proceeded to search Tseng's entire body manually, including her breasts and groin area. The search, conducted outside Tseng's clothing, lasted 15 minutes. Security guards also searched Tseng's baggage. The security search of Tseng and her baggage conformed to El Al procedures, which had been adopted pursuant to Federal Aviation Administration regulations.

Following the search, El Al decided that Tseng did not present a security risk after all and she was permitted to board her flight. Plaintiff testified that, as a result of defendant's search, she "was really sick and very upset" during the course of the flight, and "emotionally traumatized and disturbed" throughout her month-long trip to Israel and thereafter. Subsequently, she underwent medical and psychiatric treatment; but, at no time did Tseng claim she suffered any physical injury as a result of the bodily search.

During the flight plaintiff was unable to locate several personal items she had in her carry-on bag, and, upon arriving in Tel Aviv, she was missing, among other things, $1000 in cash and a diamond Rolex watch. Tseng did not inquire about the lost items during her flight or upon landing in Tel Aviv. However, while at the Tel Aviv airport she did inquire about her camera, which had been confiscated at JFK to be X-rayed. When plaintiff arrived at her hotel, she telephoned the airline's Tel Aviv office to inquire about the camera and the other missing items. She testified that an El Al representative informed her that she must take care of the matter in New York, and that the airline was "not interested in [her] missing items." On July 1, 1993, having returned from her trip, Tseng provided written notice to El Al's New York office that several items that accompanied her to the El Al Terminal for departure on her trip were either missing or damaged.

Since she did not obtain a satisfactory response, plaintiff initiated the action giving rise to this appeal by filing a complaint in May 1994 in the New York State Supreme Court for New York County. The complaint alleged a state law personal injury claim arising from the assault and false imprisonment; it also asserted a property claim relating to her lost and/or damaged property. El Al removed the case to federal court pursuant to 28 U.S.C. § 1441(d), because El Al is a "foreign state" within the meaning of 28 U.S.C. § 1603(a), which provides that "[a] 'foreign state' . . . includes a political subdivision of a foreign state or an agency or instrumentality of a foreign state."

In federal court, El Al argued that plaintiff's action was governed by the Warsaw Convention. The district court agreed, ruling it applicable because the airline's search of plaintiff constituted an "accident" within the meaning of Article 17. In applying the Convention, the trial court found the carrier liable under Article 18 for the loss and damage to Tseng's carry-on and checked baggage, and awarded her $1,034.90. The property loss award was calculated under Articles 22(2) and (3) of the Convention, which limit recovery for checked baggage to 250 francs per kilogram of baggage, and limit recovery for carry-on baggage to 5000 francs per person. These amounts have been converted to $20 per kilogram, or $9.07 per pound, for checked baggage and $400 per passenger for carry-on luggage. *See* 14 C.F.R. § 221.176(a); Warsaw Convention Liability

Limitations, 39 Fed.Reg. 1526 (1974). Because the weight of Tseng's baggage could not be determined, the district court used the maximum weight allowed by El Al for checked baggage—70 pounds—to make its calculation. Tseng's personal injury claim was dismissed because she failed to show a physical injury as required by Article 17.

Plaintiff appeals the dismissal of her personal injury claim and El Al cross-appeals from the property damage award. We affirm, in part, and reverse, in part, and remand to the district court for further proceedings.

## DISCUSSION

We are presented with two issues of considerable import. First, we must determine whether the security search of a passenger initially suspected of presenting a possible risk of terrorism but who is later determined not to present a danger constitutes an "accident" within the meaning of Article 17 of the Warsaw Convention. Second, if the answer to the first question is "no," we must then determine whether the Convention provides the exclusive avenue for recovery of injuries sustained during international air travel even in cases where the terms of the Convention do not apply and it does not therefore subject the carrier to liability for damages.

Because there are a number of decisions setting forth the basic structure of the Convention—a comprehensive overview of it is set forth in *In re Air Disaster at Lockerbie, Scotland,* 928 F.2d 1267, 1270–71 (2d Cir. 1991) [*Lockerbie I* ]—we discuss it only insofar as necessary to the resolution of the issues before us.

## I Article 17

### A. *Definition of "Accident"*

Tseng maintains it was error to dismiss her personal injury claims for want of a cognizable injury. The district court ruled that a security search of a passenger based upon suspicion of circumstances that turned out not to involve any danger constitutes an accident, subjecting the carrier to liability under Article 17. Carrier liability for personal injuries sustained by passengers en-

gaged in international air travel is governed by Article 17 of the Convention, which states:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.

■ Article 17 applies where (1) an accident has occurred, in which (2) a passenger suffered death, wounding, or any other bodily injury, and (3) the accident occurred either on board the aircraft or in the course of embarking or disembarking from the plane. *See Eastern Airlines, Inc. v. Floyd,* 499 U.S. 530, 535–36, 111 S.Ct. 1489, 1493–94, 113 L.Ed.2d 569 (1991). All three of these requirements must be met to invoke Article 17 liability. If a passenger satisfies the requirements for Article 17 liability, the amount of that liability was once limited to $75,000, *see In re Air Disaster at Lockerbie Scotland,* 37 F.3d 804, 812 (2d Cir.1994), but 77 international carriers recently agreed to eliminate the $75,000 liability cap and impose strict liability up to 100,000 Special Drawing Rights (SDRs), roughly equivalent to $145,000, *see International Air Transport Association Intercarrier Agreement on Passenger Liability, approved by* D.O.T. Order 96–11–6, 1996 WL 656334 (D.O.T. Nov. 12, 1996). *See* DOT Approval Allows Liability Limits to be Abolished, Air Safety Wk., Nov. 18, 1996. However, a plaintiff may not recover for purely psychic injuries. *See Floyd,* 499 U.S. at 552, 111 S.Ct. at 1502.

■ Although the Convention does not define the term "accident," the Supreme Court describes it as "an unexpected or unusual event or happening that is external to the passenger." *Air France v. Saks,* 470 U.S. 392, 405, 105 S.Ct. 1338, 1345, 84 L.Ed.2d 289 (1985). Yet "not every identifiable incident or occurrence during a flight is an accident within the meaning of Article 17 even if the incident or occurrence gives rise to an injury." *Quinn v. Canadian Airlines Int'l Ltd.,* No. 35558/91U, 1994 Ont. C.J. LEXIS 1695, at *10 (Ct.Just. May 30, 1994) (air turbulence

not an accident); *see Pflug v. Egyptair Corp.*, 961 F.2d 26, 28–29 (2d Cir.1992) (hijacking is an accident).

■ Thus, "accident" does not include the normal operation of the aircraft or the procedures followed by airline personnel in the normal course of air travel, even though they may cause illness in a passenger. As the Supreme Court stated in *Saks*, "[W]hen the injury indisputably results from the passenger's own internal reaction to the usual, normal, and expected operation of the aircraft, it has not been caused by an accident." *Saks*, 470 U.S. at 406, 105 S.Ct. at 1345.

**B.** *Security Search Not an "Accident"*

■ We turn now to consider whether the security search of Tseng was an accident under Article 17. Several reasons lead us to part from the district court, which thought it was. In the first place, being subjected to a personal search is a distasteful but a routine procedure of international air travel. As such, it cannot be considered an "accident" regardless of a passenger's subjective reaction to it. Or, as we just stated, not every incident occurring during a flight or in the process of embarking or disembarking is an "accident" within the meaning of Article 17.

Security clearance of one degree or another is part of every passenger's experience. Not infrequently, these initial procedures lead to additional measures, such as the use of a metal detecting wand or a security search. These events are a routine part of international travel. Whether appellant expected to be subjected to a security search is not a relevant consideration because she reasonably should have been aware that she might be.

Every air carrier is required by Federal Aviation Administration regulations to have in place security procedures to prevent terrorist attacks and to deny transport to anyone who does not consent to be searched upon request. *See* 14 C.F.R. § 129.25(b), (g)(1)-(2). As part of these security procedures, carriers are required to screen all passengers and baggage prior to boarding. *See* 49 U.S.C. § 44901(a) (requiring screening of passengers); 49 U.S.C. § 44906 (ap-

plying standards to foreign air carriers); 14 C.F.R. § 108.9(a). In accordance with these requirements, El Al conducts security searches of passengers daily. For example, in 1993 it conducted two to four security searches a day. Hence, as in *Saks*, this case appears simply to involve Tseng's personal reaction to the routine operating procedures of the defendant airline.

A further reason we cannot conclude that this incident was an "accident" within the terms of the Convention is because the Convention does not aim to derogate from the efforts of international air carriers to prevent violence and terrorism, efforts which are widely recognized and encouraged in the law. *See, e.g.,* 49 U.S.C. § 44901(a); 49 U.S.C. § 44906; *Day*, 528 F.2d at 34, 37 n. 18 (recognizing the goal of accident prevention); 14 C.F.R. § 108.9(a) (screening utilized to "prevent or deter the carriage aboard airplanes of any explosive, incendiary, or a deadly or dangerous weapon").

Inherent in any effort to detect malefactors is the risk that innocent persons will be subjected to scrutiny and inconvenience. *Cf. Anderson v. Creighton*, 483 U.S. 635, 641, 107 S.Ct. 3034, 3039, 97 L.Ed.2d 523 (1987) ("[I]t is inevitable that law enforcement officials will in some cases reasonably but mistakenly conclude that probable cause is present. . . ."). This is especially true in airports, where security personnel have only brief interaction with passengers, and must rely on such investigative tools as risk profiles, as was the case here, because there is insufficient time to conduct a more extensive investigation. The inconvenience and embarrassment to the individual passenger of being erroneously searched, therefore, is the price passengers pay for the degree of airline safety so far afforded them. To this end, courts have recognized that airport security officials are to some extent freed from the exacting requirements typically attached to governmental searches of individuals. *See, e.g., United States v. Bell*, 464 F.2d 667, 675 (2d Cir.1972) (Friendly, C.J., concurring); *New York v. Waring*, 174 A.D.2d 16, 19, 579 N.Y.S.2d 425 (App.Div.2d Dep't), *appeal denied*, 79 N.Y.2d 1009, 584 N.Y.S.2d 463, 594 N.E.2d 957 (1992). To suppose the drafters

of the Convention aimed to impose close to absolute liability on air carriers for searches that disclosed no danger seems to us highly unlikely.

■ Our final reason deals with appellant's misapprehension regarding two Articles of the Convention. Tseng appears to assert that El Al's conduct is "wilful misconduct" covered under Article 25 and therefore the carrier's actions cannot constitute an "accident" within the meaning of Article 17. Plaintiff's view is based upon a misunderstanding of the Convention. The two articles are not mutually exclusive; rather the finding of an "accident" under Article 17 is a prerequisite to the imposition of any liability for the personal injuries of a passenger. *See Saks,* 470 U.S. at 396, 105 S.Ct. at 1340; *MacDonald v. Air Canada,* 439 F.2d 1402, 1404 (1st Cir.1971). Article 25 simply describes a subset of "accidents" that are more egregious and to which a greater degree of culpability attaches.

In sum, from the above authorities, we derive the following: a carrier is liable in damages for an accident on board the aircraft or in the course of embarking or disembarking that causes the death or wounding or any other bodily injury of a passenger. An "accident" is an unexpected or unusual event that is external to the passenger; but, "accident" does not include illness suffered by the passenger as a reaction to the ordinary events and procedures of air transportation. As a consequence, we hold that even though the event of which plaintiff complains occurred during the course of her embarkation on defendant's airplane, there was no accident and she suffered no bodily injury. Hence, under the terms of Article 17 of the Warsaw Convention, El Al may not be held liable in damages to her.

## II   The Exclusivity of the Convention

### A.   *State Cause of Action Lies When Convention Inapplicable*

■ Having ruled that the search of Tseng does not constitute an "accident," we now must determine whether the Convention provides the exclusive remedy for personal injuries sustained in the course of international air travel, such that Tseng is precluded from pursuing her state law claims for false imprisonment and battery. This is an issue the district court did not decide because it determined the Convention was applicable. The Supreme Court has twice declined to address the exclusivity of the Convention where its terms are *inapplicable. See Floyd,* 499 U.S. at 553, 111 S.Ct. at 1502; *Saks,* 470 U.S. at 408, 105 S.Ct. at 1346.

In *Lockerbie I* we stated in dictum that "a plaintiff plainly may institute" "a state cause of action when the claim does not arise under the Warsaw Convention." 928 F.2d at 1273. With the issue now squarely before us, we reaffirm that proposition and hold that state law claims are not precluded by the Warsaw Convention where the event or occurrence giving rise to the injury is found to be outside the Convention.

### 1.   Convention's Text

Support for this view is found in the text of the treaty and in the context in which the words in it are used. *See Floyd,* 499 U.S. at 534, 111 S.Ct. at 1492–93 (noting that treaty interpretation should begin with the text), *Saks,* 470 U.S. at 396–97, 105 S.Ct. at 1340–41 (same); *see also* Vienna Convention on the Law of Treaties art. 31, *open for signature* May 23, 1969, U.N. Doc. A/CONF. 39/27 (1969), *reprinted in* 63 Am. J. Int'l L. 875, 885 (1969). The exclusivity provision of the Convention is found in Article 24, which provides:

(1) In the cases covered by articles 18 and 19 any action for damages, however founded, can only be brought subject to the conditions and limits set out in this convention.

(2) In the cases covered by article 17 the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

The provision clearly states that resort to local law is precluded only where the incident is "covered" by Article 17, meaning where there has been an accident, either on the plane or in the course of embarking or disembarking, which led to death, wounding or

other bodily injury, *see Floyd,* 499 U.S. at 535–36, 111 S.Ct. at 1493–94. To extend the scope of the Convention's exclusivity beyond that which it expressly provides would require rewriting Article 24 or Article 17, a task only the signatories to the Convention may undertake. *See Saks,* 470 U.S. at 406, 105 S.Ct. at 1345; *see also Brink's Ltd. v. South African Airways,* 93 F.3d 1022, 1027 (2d Cir.1996) (the task of interpretation begins with the "literal language" of the treaty), *cert. denied,* —— U.S. ——, 117 S.Ct. 959, 136 L.Ed.2d 845 (1997).

### 2. Drafting History

The plain meaning of Article 24 is also supported by reference to the drafting history, or *travaux preparatoires,* of the Convention. "[T]reaties are construed more liberally than private agreements, and to ascertain their meaning we may look beyond the written words to the history of the treaty, the negotiations, and the practical construction adopted by the parties." *Choctaw Nation of Indians v. United States,* 318 U.S. 423, 431–32, 63 S.Ct. 672, 678, 87 L.Ed. 877 (1943); *see also* Vienna Convention, *supra,* art. 32, *reprinted in* 63 Am. J. Int'l L. at 885 (it is appropriate to use supplementary materials to "confirm the meaning resulting from" a contextual reading of the treaty's plain language).

The *travaux preparatoires* indicate that national law was intended to provide the passenger's remedy where the Convention did not expressly apply. During the conference, the Czechoslovakian delegation proposed an additional article that read: "In the absence of provisions in the present Convention, the provisions of laws and national rules relative to carriage in each State shall apply." *Minutes, supra,* at 176. The intent of the proposed article was set forth in its proviso: "Provided that the case which arises was not provided for in the Convention, it's the common law which is applicable." *Id.* However, the Czechoslovakian delegation was satisfied that its concern was addressed and withdrew its proposal when the title of the Convention was amended to refer to the unification of "*certain rules,*" thereby indicating "the special nature of the Convention." *Id.* (emphasis added); *see id.* at 188. Other

delegates assumed it beyond question that the Convention was nonexclusive where it did not apply. For example, when asked what law would be applicable to cases excluded from the Convention under Article 34 (experimental trials exception), the French delegate exclaimed that "[n]aturally" the common law would apply. *Id.* at 85–86.

### B. *Other Decisional Law and Scholarly Comment*

Moreover, a number of courts and commentators have concluded that the Convention provides the exclusive remedy only where its provisions expressly apply. *See, e.g., Schroeder v. Lufthansa German Airlines,* 875 F.2d 613, 618 (7th Cir.1989) (court reached plaintiff's state law claims after determining that the Convention was not implicated); *Abramson,* 739 F.2d at 134 ("if [the Convention] does not apply, it leaves liability to be established according to traditional common law rules"); *Martinez Hernandez,* 545 F.2d at 284; *Tandon v. United Air Lines,* 926 F.Supp. 366, 370–71 (S.D.N.Y. 1996); *Beaudet v. British Airways, PLC,* 853 F.Supp. 1062, 1072 (N.D.Ill.1994) (state law negligence claim not pre-empted where Convention is inapplicable); *Levy v. American Airlines,* No. 90 Civ. 7005, 1993 WL 205857, at *5 (S.D.N.Y. June 9, 1993), *aff'd,* 22 F.3d 1092 (2d Cir.1994); *Walker,* 785 F.Supp. at 1173 (S.D.N.Y.); *Fischer v. Northwest Airlines, Inc.,* 623 F.Supp. 1064, 1066 (N.D.Ill. 1985) (denying motion to dismiss state law claims, but dismissing Convention claims); *Rolnick v. El Al Israel Airlines, Ltd.,* 551 F.Supp. 261, 264 (E.D.N.Y.1982) (permitting pursuit of state law claim after finding passenger's slip on escalator not to have been within the Convention); Giemulla et al., *supra, Warsaw Convention* art. 1, para. 35 ("Where the Convention is not applicable, national law will be applied."); Lawrence B. Goldhirsch, *The Warsaw Convention Annotated: A Legal Handbook* 62 (1988) ("Where there is no 'accident' the Warsaw Convention is probably inapplicable and the passenger may proceed to use local law to prove a claim."); René H. Mankiewicz, *The Liability Regime of the International Air Carrier: A Commentary on the Present Warsaw System*

2, 13 (1981); Luis F. Ras, *Warsaw's Wingspan Over State Laws: Towards a Streamlined System of Recovery*, 59 J. Air L. & Com. 587, 589 (1994). *But see Potter v. Delta Air Lines, Inc.*, 98 F.3d 881, 885 (5th Cir.1996) ("The Convention's goals of uniformity and certainty would be frustrated were we to allow Mrs. Potter to assert her state law claims, even where the Convention does not provide her a remedy."); *Salazar v. Mexicana Airlines*, 20 Av. Cas. (CCH) ¶ 17,114, at ¶ 17,115 (W.D.Tex.1986) (same); *Sidhu v. British Airways plc* [1997] 1 All E.R. 193, 207 (H.L.1996) (U.K.) (same).

### C.  *Contrary Arguments Refuted*

Two arguments have been advanced in support of the proposition that the Convention is wholly exclusive. We reject both. The first is a structural argument advanced in Great Britain. *See Sidhu* [1997] 1 All E.R. at 205–07. In the view of the English courts, Article 17 is intended to provide exhaustively for the circumstances under which a carrier may be held liable. *See id.* at 207. According to the House of Lords, the purpose of Article 17 is "to prescribe the circumstances, that is to say the only circumstances, in which a carrier will be liable in damages to the passenger for claims arising out of his international carriage by air." *Id.* Interpreted in this fashion, the English courts read Article 24's reference to "cases covered under article 17" to mean those cases within the Convention not covered by Articles 18 (baggage) and 19 (delay), rather than to distinguish between incidents of personal injury that are or are not within the provisions of the Convention. *See id.*

We recognize that a construction of the Convention by our sister signatories is "entitled to considerable weight," *Saks*, 470 U.S. at 404, 105 S.Ct. at 1344, but remain unpersuaded to follow the course laid out in *Sidhu.*

For one thing, the Convention is not an exhaustive set of rules and guidelines dealing with international air travel, as is evident from its formal title. As one commentator explained, "the Convention was not intended to govern the entire relationship between air carriers and passengers ..., and does not propose to unify all such rules." Ras, *Warsaw's Wingspan, supra,* at 589; *see* Mankiewicz, *The Liability Regime, supra,* at 13, 91.

For another, neither the text nor the *travaux preparatoires* reveal an aim to provide in an exhaustive way for the liability of the carrier for all personal injuries. It is widely accepted that one of the two primary purposes of the Convention was to shield carriers from financial catastrophe following in the wake of a major accident. *See MacDonald v. Air Canada*, 439 F.2d at 1405; Andreas F. Lowenfeld & Allan I. Mendelsohn, *The United States and the Warsaw Convention*, 80 Harv. L.Rev. 497, 499 (1967). To that end, the Convention limits airline liability for accidents. But the Convention does not purport to insulate carriers from the ordinary risks of doing business, such as keeping their facilities in good repair. An injury to a passenger caused, for example, by a failure of a carrier to keep its walkways in a safe condition is hardly the type of catastrophic incident that would likely force even a fledgling airline out of business, and cannot be assumed to have been within the contemplation of the drafters of the Convention.

Given the self-described limitation of the Convention, it seems illogical to extend its scope beyond that for which it explicitly provides.[3] It is not tenable to believe the Convention meant to address the more ordinary type of personal injury without some express statement in the text to that effect. Such reading would lead to the absurd result of allowing carriers to escape liability for their

---

3. The intention of the drafters appears perfectly plain: gaps left in the regulation of international air carriage would be filled in by subsequent agreements. This point was made in a request by the French delegation to the conference:

> Considering that the Warsaw Convention provides only for certain difficulties relating to air carriage and that international air navigation raises many other questions that it would

be desirable to provide for by international agreements,

> Expresses the wish:
> That, through the offices of the French Government, which has taken the initiative of the convening of these conferences, that there be convened subsequently, new conferences which will pursue the work of unification.

*Minutes, supra,* at 182.

negligence—or even their intentional torts—so long as the event giving rise to the injury was not an accident occurring on an airplane or in the course of embarking or disembarking as narrowly circumscribed by the definition of Article 17's meaning.

For example, it is generally accepted that a passenger injured while riding an escalator in the airline terminal does not have recourse under Article 17. *See, e.g., McCarthy,* 56 F.3d at 317 (passenger's slip on escalator not in the course of embarking or disembarking); *Abu Hamdeh v. American Airlines, Inc.,* 862 F.Supp. 243, 247–48 (E.D.Mo.1994) (same); *Rolnick,* 551 F.Supp. at 264 (same). Were we to read Article 17 to provide the exclusive remedy for personal injury, a carrier would not be liable for injuries caused by the malfunctioning of an escalator, notwithstanding the fact that it may have recklessly disregarded its duty to keep it in proper repair. Beyond the inequity of forcing the passenger to bear the cost of an airline's negligence, safeguarding an airline from this sort of liability removes the incentive for it to maintain its premises properly—an important goal of domestic tort law. *See* W. Page Keeton et al., *Prosser and Keeton on the Law of Torts* § 4, at 25 (5th ed. 1984) ("When the decisions of the courts become known, and defendants realize that they may be held liable, there is of course a strong incentive to prevent the occurrence of the harm."); *cf. Day,* 528 F.2d at 34 (airlines are in better position to assess risks and prevent accidents).

The second argument advanced in support of holding the Convention wholly exclusive is that permitting state law claims under· any circumstances contravenes the Convention's goal of uniformity. *See Potter,* 98 F.3d at 885. This argument is flawed in two respects. First, while uniformity is certainly one of the two primary goals of the Convention, such a goal has not always been found feasible in all areas of international travel. Second, even where possible, uniformity cannot justify altering the operating structure of the Convention. *See Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, ——, 116 S.Ct. 629, 636, 133 L.Ed.2d 596 (1996) (rejecting application of general maritime law to all Convention cases regardless of whether mar-

itime law would naturally apply). We have read *Zicherman* to instruct specifically that the Convention expresses no compelling interest in uniformity that would warrant us in supplanting an otherwise applicable body of law, here state law. *See Pescatore v. Pan American World Airways, Inc.,* 97 F.3d 1, 11 (2d Cir.1996). Even to accept the argument that uniformity should prevail where the Convention does not apply does not support the ultimate proposition that the Convention must therefore provide the exclusive remedy, because uniformity could be achieved equally as well by allowing recovery outside the Convention, under a uniform body of· law. Of course, once the Convention is ruled inapplicable the carrier may, in a liability suit against it under domestic law, interpose all the defenses available to it under that law.

### D. Passengers' Interests

█ Finally, excluding state law claims where the Convention does not apply is inconsistent with the Convention's goal of protecting passengers. Underlying the desire for uniformity and limited liability for the carrier was a desire to balance the interests of the passenger and the carrier. *See Lockerbie I,* 928 F.2d at 1271. In return for certainty and limited liability, the carriers accepted presumed fault when the Convention applied, so that passengers or their survivors could obtain recovery in situations where it might be difficult to prove a carrier's negligence. *See id.*

Over the past several decades, international air transportation has transformed from a fragile, fledgling industry into one that is well established and financially secure. In recognition of the increasing strength of the airline industry, the balance has properly shifted away from protecting the carrier and toward protecting the passenger, *see Day,* 528 F.2d at 37, evidenced by the recent intercarrier agreement abandoning the Convention's liability cap and imposing strict liability up to $145,000.

Reading the Convention to preclude recovery for injuries sustained outside the scope of the Convention would undermine the notion of balancing the interests of the carrier and the passenger. Under such a scheme, the carrier would be disproportionately favored by being absolved from liability for its tor-

tious conduct, except under certain limited circumstances. The passenger would be forced to bear the cost of injury, despite the airline being in a better position to distribute the costs of such injuries and to prevent them from occurring. *See* Keeton, *Law of Torts, supra,* § 4, at 24 (Tort law tends to place the burden on the corporation, "who by means of rates, prices, taxes or insurance are best able to distribute" risks and losses.). It is highly doubtful that such a skewing of interests was in the contemplation of the original drafters of the Convention, and such an interpretation is clearly at odds with the current goals of the Convention. Consequently, we hold that where the Convention is inapplicable, a plaintiff may seek recourse under state law.

## CONCLUSION

We have reviewed El Al's cross-appeal concerning the district court's findings and conclusions embodied in its judgment regarding Tseng's baggage claim and find it to be without merit. Accordingly, the judgment is reversed with respect to Tseng's personal injury claim and affirmed with respect to her baggage claim. Plaintiff's personal injury cause of action is remanded to the district court, which, should it determine it proper to exercise pendent jurisdiction, may then resolve Tseng's outstanding state law claims in accordance with this opinion.