**Joan TURTURRO, Plaintiff,**

v.

**CONTINENTAL AIRLINES, Defendant.**

**Joan Turturro, Plaintiff,**

v.

**The Port Authority of New York and New Jersey, "Jane" Brown, and "John Does" 1–5, Defendants.**

**No. 00 CIV. 637(WK), 00 CIV. 8870(WK).**

United States District Court, S.D. New York.

Jan. 16, 2001.

---

Paul A. Shneyer, New York, NY, for Plaintiff.

George P. McKeegan, McKeegan, McShane & Drago, P.C., New York, NY, for Defendant.

## OPINION & ORDER

WHITMAN KNAPP, Senior District Judge.

Defendant Continental Airlines (hereinafter "Continental") moves for summary

judgment or to dismiss the Complaint filed against it for failure to state a claim. Plaintiff Joan Turturro (hereinafter "plaintiff") requests that if revision could cure a defect in her pleadings, we should grant her leave to amend her complaint. Fed. R.Civ.P. 15(a). Continental has opposed any amendment.

This motion raises issues regarding the treaty popularly known as the "Warsaw Convention" (hereinafter the "Convention"), which governs international air travel. 49 Stat. 3000, 49 U.S.C. § 40105 note. For reasons discussed below, we consolidate the two pending actions, grant plaintiff leave to amend, and dismiss some of her present and proposed claims on grounds of preemption and failure to state a claim. We deny Continental's motion in all other respects because material questions of fact remain regarding alleged communications between Continental and its co-defendants.

## BACKGROUND

We review the facts in the light most favorable to plaintiff, resolving all ambiguities and drawing all reasonable inferences in her favor. According to plaintiff, on January 26, 2000, someone stole her pocketbook at Newark International Airport. After she boarded a Continental Airlines flight bound for Costa Rica, she discovered that her medication, Xanax, had been in the pocketbook. Doctors prescribe Xanax, a brand name for Alprazolam, to treat panic attacks and to relieve anxiety and nervousness. For several years, plaintiff had been taking Xanax on a daily basis, and she had taken some at the airport before the theft. However, given her longstanding fear of flying, she became concerned that the medication would wear off during the 5½-hour journey. Hence, before the airplane pulled back from the departure gate, plaintiff called a flight attendant, explained her situation, and asked to disembark. That flight attendant responded that he could not help her. Plaintiff next alerted a second attendant, who

also stated that she could take no action. The first attendant later told plaintiff that the pilot refused to return to turn back.

According to plaintiff's Affidavit in Opposition to the instant motion (dated November 20, 2000), after she had been denied a third time, she began to feel increasingly agitated and terrified at the prospect of flying without her medicine. She started to sweat and to feel dizzy, nauseated, and short of breath. She also felt her heartbeat accelerate and felt pain in her stomach.

In a panic, plaintiff repeatedly called "911" on her cellular telephone and begged for help. The police then contacted the pilot, who now decided to return to the gate. A Continental employee announced over the loudspeaker that an "unruly" passenger wished to leave; some fellow passengers then greeted plaintiff with hisses and jeers.

The first flight attendant that plaintiff had spoken with escorted her off of the aircraft. Thirty to forty minutes had passed from the time of plaintiff's initial conversation with that attendant to the time that the airplane turned around. About sixty to ninety minutes elapsed from the time the plane left the gate to the time that it returned.

Plaintiff and the flight attendant walked across a boarding bridge and passed through at least one gate into a waiting area of the airport terminal, where they were met by some Continental employees, by medical personnel, and by police employed by the defendant Port Authority of New York and New Jersey (the "Port Authority"). Continental representatives gave information to the EMS technicians and to the police, who interviewed plaintiff. In any event, the Port Authority allegedly made the decision to transport plaintiff against her will to the psychiatric emergency room at Elizabeth General Medical Center (the "Center"), where she remained in custody and under observation for several hours.

One key aspect of this case involves whether plaintiff sustained physical injuries. Her original Complaint, dated January 27, 2000, and her proposed Amended Complaint, dated August 4, 2000, list her damages as: "Embarrassment, humiliation, loss of liberty, psychological injury, pain, suffering, emotional distress and mental anguish..." Her interrogatory responses refer to her "post traumatic stress, psychological injury, pain... [P]laintiff believes that the injuries may be permanent." At her deposition, plaintiff repeated that Continental had "traumatized" her, then clarifying that she meant "psychiatric, psychological trauma."

According to her November 20th Affidavit, plaintiff's heart was still racing, her stomach ached, and she continued to feel nauseated after deplaning. An EMS technician who examined her at the terminal immediately after she returned there testified that plaintiff appeared "agitated" but not "aggressive," and that she said that she was "fine." Continental claims that the Center's medical reports do not suggest that plaintiff exhibited any serious physical symptoms. For example, the records recite that she displayed "good color." However, we find much of the handwriting therein illegible and/or in medical jargon.

Plaintiff asserts that she continued to suffer symptoms after the Center released her. For about three months thereafter, she experienced insomnia, restlessness, inability to concentrate, and unexplained aching in her arms and legs. She described herself as "shell-shocked" (Pl. Dep. at 77–78). Some symptoms persisted even longer, namely, sleeplessness, occasional inability to focus, and the aching extremities.

Plaintiff declares that her psychiatrist, Dr. Sylvia Olarte, diagnosed her with "post-traumatic stress syndrome" (*Id.* at 79). However, Olarte confusingly made two different diagnoses as of January 2000. On a January 28th invoice, she diagnoses "acute stress disorder," which by definition applies only to symptoms occurring within one month after an extremely stressful incident. (Olarte Invoices, attached to McKeegan Aff., Ex. C, at 0005–0006; *cf. Diagnostic & Statistical Manual of Mental Disorders IV* (APA 4th ed.1997) (hereinafter "*DSM IV*"), code # "308.3," at 431). On a March invoice, however, Orlate lists some other diagnosis for January, February, and March, and that diagnostic code does not coincide with the standard one for post-traumatic stress disorder (hereinafter "PTSD"). The code as written appears to be "300.02" (generalized anxiety disorder). In contrast, the code for PTSD is quite different—"309.81." (*See id.* at 424).

The proposed Amended Complaint alleges the following causes of action against Continental: (1) constitutional violations for falsely imprisoning plaintiff via action "in concert with" the Port Authority Police; (2) common law false imprisonment for refusing plaintiff permission to deplane; (3) defamation (apparently both for remarks directed to passengers and for other remarks directed to the police); (4) intentional infliction of emotional distress for manufacturing false allegations about plaintiff that led to her involuntary detention; and (5) discrimination on the basis of a medical condition, in contravention of federal statutory law. The Amended Complaint also levels causes of action against the Port Authority, a Ms. Brown, and several fictitious defendants.

## DISCUSSION

In Part I below, we find that plaintiff has not sufficiently alleged "bodily injury," as that term is invoked in the Warsaw Convention; consequently, she cannot recover damages under the Convention for any incidents that took place on board the airplane or during "disembarking." Part II concludes that the Convention preempts any other causes of actions relating to such incidents. Part III construes the term "disembarking" and holds that plaintiff may proceed against Continental on al-

leged federal and state violations taking place *after* disembarkment had terminated.

## I. "BODILY INJURY"

■ Article 17 of the Warsaw Convention provides that:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the operations of embarking or disembarking.[1]

We are called upon to decide whether plaintiff has pled sufficient allegations to underpin a Warsaw Convention lawsuit against Continental. We conclude that she has not, for her alleged injuries do not fall within the French phrase *"lésion corporelle"* in the authentic text of Article 17 (unofficially translated as "bodily injury" in the above-quoted version, which the Senate employed when it ratified the Convention in 1934). *See Eastern Airlines, Inc. v. Floyd* (1991) 499 U.S. 530, 534, 111 S.Ct. 1489, 113 L.Ed.2d 569, *rev'g* 872 F.2d 1462 (11th Cir.1989), *rev'g* 629 F.Supp. 307 (S.D.Fla.1986).

■ In 1991, the Supreme Court, in a unanimous decision, interpreted the rele-vant phrase (*lésion corporelle*) not to cover "mental or psychic injuries unaccompanied by physical injury or physical manifestation of injury." *Id.* at 533, 552, 111 S.Ct. 1489. The Court declined to express a view as to whether passengers can perhaps recover "for mental injuries that are accompanied by physical injuries." *Id.* at 552, 111 S.Ct. 1489.

In that lawsuit (*Floyd*), the plaintiffs traveled on a flight that experienced a rapid loss of altitude, during which the crew announced that the plane would be ditched in the ocean. (The crew then managed to land the plane safely at an airport.) In consequence of their terrifying ordeal, the plaintiffs alleged "severe and permanent mental pain and anguish" and the "inability to lead a normal life." These symptoms allegedly required "medical expenses." Floyd Am. Compl. ¶¶ 13, 16, available at 1990 WL 511332, at *5a, 6a.[2] Although not expressly alleged as such, probably many of these individuals suffered what we may call "psychosomatic" sequelae (such as insomnia or weight loss) as a result of their acute fear while airborne.[3] The trial court, however, broadly characterized loss of sleep, anxiety, and stress as "solely... mental distress." 629 F.Supp. at 312 (citing *Krystal v. British Overseas Airways Corp.* (C.D.Cal.1975)

---

1. The facts of the present case fall under the Convention's broad definition of "accident." *See El Al Israel Airlines, Ltd. v. Tsui Yuan Tseng* (1999) 525 U.S. 155, 166 n. 9, 119 S.Ct. 662, 142 L.Ed.2d 576 (citing *Air France v. Saks* (1985) 470 U.S. 392, 405, 105 S.Ct. 1338, 84 L.Ed.2d 289); *Wallace v. Korean Air* (2d Cir.2000) 214 F.3d 293, 297–99, *petition for cert. filed*, 69 U.S.L.W. 3281 (U.S. Oct. 10, 2000) (No. 00–560); *see also, e.g., Carey v. United Airlines, Inc.* (D.Or.1999) 77 F.Supp.2d 1165, 1170–71 (citing *Saks*).

2. The plaintiffs in the consolidated lawsuit represented that "their complaints are identical in all respects material to" their appeal, and since the defendant did not challenge that representation, the Court of Appeals accepted it as true. Hence, the Eleventh Circuit worked from the complaint of Ms. Rose Marie Floyd and her husband. 872 F.2d at 1466 n.

4. That Court permitted some plaintiffs to amend their complaints to allege "physical injury." *Id.* at 1490 & n. 45; 937 F.2d 1555, 1556 (11th Cir.1991) (on remand). The Supreme Court did not consider those plaintiffs' new claims. *See* 499 U.S. at 533, 111 S.Ct. 1489 (passenger-plaintiffs before the Court claimed damages "solely for mental distress").

3. We employ the word "psychosomatic" in both senses: "1. of or pertaining to a physical disorder that is caused by or notably influenced by emotional factors; and 2. pertaining to or involving both the mind and the body." *Webster's New Universal Unabridged Dictionary* 1561 (1996). A somewhat more restricted definition reads, "Of or relating to a disorder having physical symptoms but originating from mental or emotional causes." *American Heritage Dictionary* 1415 (4th ed.2000).

403 F.Supp. 1322, 1322–23); *cf. Jack v. Trans World Airlines, Inc.* (N.D.Cal.1994) 854 F.Supp. 654, 664; *Terrafranca v. Virgin Atlantic Airways Ltd.* (3d Cir.1998) 151 F.3d 108,·111 (both decisions erroneously attributing insomnia to the *Floyd* plaintiffs based upon the trial court opinion in that litigation).

Because the Supreme Court in *Floyd* dismissed all claims, it necessarily envisioned all of the injuries alleged in the complaint as "purely" mental, psychic, or emotional disorders as opposed to "physical injury or physical manifestation of injury." *See id.; Floyd,* 499 U.S. at 534, 553, 111 S.Ct. 1489 (citing the Floyd Amended Complaint); 872 F.2d at 1466. Below, we analyze *Floyd* in more depth and conclude that it excludes psychosomatic illnesses from its conception of "physical manifestation of injury."

More recently, the Supreme Court apparently has reiterated that persistent psychosomatic symptoms not unlike some of those exhibited by the instant plaintiff do not constitute "bodily injury." *See El Al Israel Airlines, Ltd. v. Tseng* (1999) 525 U.S. 155, 166 n. 9, 119 S.Ct. 662, 142 L.Ed.2d 576, *rev'g* 122 F.3d 99 (2d Cir. 1997), *aff'g in part, rev'g in part* 919 F.Supp. 155 (S.D.N.Y.1996). In *Tseng,* the defendant airline, as a pre-boarding security measure, subjected the plaintiff to an extensive search of her person. "Traumatized and humiliated, [plaintiff] left feeling raped." Brief for Respondent, *El Al Israel Airlines, Ltd. v. Tseng* (U.S. July 29, 1998) (No. 97–475) 1998 WL 438498, at *2. During the flight, she felt "really sick, very upset" and nervous, and had a headache. *Tseng,* 122 F.3d at 101, 919 F.Supp. at 157. Later, she required medical and psychiatric treatment for "emotional[ ] trauma" and for symptoms including "headaches, upset stomach, ringing in her ears, nervousness and sleeplessness." 122 F.3d at 101, 919 F.Supp. at 157.

The District Court (Stanton, J.) had held that Tseng had not suffered the requisite injury under *Floyd:*

> Her body was not injured by the woman who searched her... On the contrary, all of her personal injuries are attributable to her shock and outrage at the way she was treated. Although her injuries may have had physical manifestations, those are the types of psychic or psychosomatic injuries barred by *Floyd*...

*Id.* at 158.

The Second Circuit reversed on the issue of preemption, and the Supreme Court then reversed, agreeing with the District Court that the Convention bestows an exclusive remedy (*see* Part II, *infra* ). "The question of whether the symptoms expressed by the plaintiff amounted to the required 'bodily injury' was not at issue before the Second Circuit and was not before the Supreme Court." *Carey v. United Airlines, Inc.* (D.Or.1999) 77 F.Supp.2d 1165, 1172–73 (citations omitted). Perhaps significantly, though, the Supreme Court throughout its 8–1 opinion declares that, "Tseng alleges psychic *or psychosomatic* injuries, but no 'bodily injury,' as that term is used in the Convention." 525 U.S. at 160, 119 S.Ct. 662 (emphasis added; *see* various definitions at note 3, *supra* ); *cf. id.* at 164, 119 S.Ct. 662 (quoting the District Court's conclusion that *Floyd* does not permit "recovery for psychic or psychosomatic injury unaccompanied by bodily injury"); *id.* at 171, 119 S.Ct. 662 (the Convention excludes recovery for "those merely traumatized" in an accident); *id.* at 172, 119 S.Ct. 662 (concluding that Tseng "sustained" only "psychic or psychosomatic injuries"). Under the circumstances; as a magistrate judge in the District of Colorado cogently noted,

> [T]he precedential value of the [Supreme] Court's determination that the plaintiff alleged no bodily injury... is somewhat questionable. Nonetheless, it is an indication that the Supreme Court would likely not find injuries purely descended from emotional distress to be compensable under the Convention.

*Carey,* 77 F.Supp.2d at 1173.

█ In fact, at least one district court has dismissed a Warsaw Convention com-

plaint alleging headaches, panic attacks, palpitations, etc., solely on the strength of the Supreme Court's commentary in *Tseng*. *Hermano v. United Airlines* (N.D.Cal. Dec. 21, 1999) No. C 99–105 SI, 1999 WL 1269187, at *4. Yet even if we shelve *Tseng* for the moment, a close reading of the controlling *Floyd* decision shows that physical manifestations of emotional distress resulting from an accident are not *per se* compensable under the Convention.

We begin with the Third Circuit's analysis of *Floyd*. While Tseng appealed to the Second Circuit, the Third Circuit followed Judge Stanton's reasoning, *supra,* holding that *Floyd* bars recovery for "physical manifestations" of emotional distress when the airplane accident causes no direct physical injury but rather merely terrifies the passengers (even when the terror later leads to physical symptoms, such as weight loss):

> At every stage of its analysis, the [Supreme Court in *Floyd* ] focused on bodily injury, not subsequent manifestations, concluding that the bodily injury requirement has a "distinctly physical scope." ... After the Court's exhaustive examination of the French text of the Warsaw Convention, its legislative history, French dictionaries, French civil law, the intent of the signatory nations, treatises, [etc.]..., [t]he Court's thorough analysis simply offers no support that *lésion corporelle* means anything other than "bodily injury." ... We reject the argument that we can ignore the full text of the Court's opinion... because of imprecise dictum at the end of the opinion [regarding "physical manifestation of injury"]. In the sentence immediately following [that phrase], the Court reverts to the phrase "physical injuries."

*Terrafranca,* 151 F.3d at 110–11 (citing *Floyd,* 499 U.S. at 547, 552, 111 S.Ct. 1489) (footnote omitted).

This reading is further bolstered in two ways. First, the *Floyd* Court took pains to attach a relatively narrow meaning to *lésion corporelle* in order to respect the "primary purpose of the contracting parties to the Convention [in 1929]: limiting the liability of air carriers in order to foster the growth of the fledgling commercial aviation industry," and the Convention's ancillary goal, to establish uniformity. *Id.* at 546 & n. 11, 552, 111 S.Ct. 1489 (citations omitted).

Second, the Court considered but rejected the idea that modern medicine has obliterated the distinction between "purely" physical and "purely" mental distress. Thus, we find it highly unlikely that the Court would muddle this distinction and thereby considerably weaken its holding, opening a back door to recovery for anyone able to allege nausea, weight loss, and the like. *See Jack,* 854 F.Supp. at 664 (refusing to contemplate expert medical opinion that "the emotional distress suffered by the plaintiffs has intrinsic physical effects"; since such a theory would have permitted the *Floyd* plaintiffs to recover on the basis of the physiologic components of their severe emotional distress, application of the theory would "eviscerate *Floyd* ").

The *Floyd* plaintiffs urged the Court that, "It [has become] increasingly evident that the mind is part of the body. Today, it is commonly recognized that mental reactions and functions are merely more subtle and less well understood physiological phenomena than [those] associated with the functioning of the tissues and organs and with physical trauma." Brief for Respondent, *Eastern Airlines, Inc. v. Floyd* (1990) (No. 89–1598) 1990 WL 511332, at *15–16 (quoting *Husserl v. Swiss Air Transport Co.* (S.D.N.Y.1975) 388 F.Supp. 1238, 1250); *see Floyd,* 499 U.S. at 534 n. 3, 111 S.Ct. 1489 (citing & overruling *Husserl* ). The plaintiffs reminded the Court that it was "not chained to discredited scientific and philosophical understandings" prevalent at the 1929 drafting of the Convention. Brief for Respondent, 1990 WL 511332, at *16–17.

Still, the Court, according significant weight not only to the drafters' manifest intentions but also to post-enactment authorities, relied throughout its opinion upon the existence of "purely psychic trauma," "purely mental injuries," and so forth. *See, e.g.,* 499 U.S. at 534, 111 S.Ct. 1489. It contrasted such injuries with plausible interpretations of *lésion corporelle,* such as "a change in the structure of an organ due to injury or disease [*modification de la structure d'un tissu vivant sous l'influence d'une cause morbide*]," i.e., "a category of physical injuries that includes internal injuries caused, for example, by physical impact, smoke or exhaust inhalation, or oxygen deprivation." *Id.* at 536, 541, 111 S.Ct. 1489. The Court also differentiated "a disturbance or aberration in a bodily organ or function" from "mere traumatisms or nervous troubles." *Id.* at 543 n. 9, 111 S.Ct. 1489; *cf. id.* at 547, 111 S.Ct. 1489 (discussing whether *lésion corporelle* might embrace lung congestion).

The Supreme Court's line-drawing remains authoritative and workable, as applied by lower court cases. For example, in *Carey, supra,* a flight attendant verbally insulted and publicly humiliated the plaintiff, which conduct allegedly later induced the plaintiff to endure nausea, cramps, perspiration, nervousness, tension, and insomnia. 77 F.Supp.2d at 1168. The plaintiff did not suffer the alleged physical symptoms "as a direct result of the incident," but rather these symptoms "appeared later as a manifestation of the emotional distress which was the direct result of the incident." *Id.* at 1171. Characterizing plaintiff's injuries as "purely psychic" in the sense intended by *Floyd,* the District Court granted summary judgment to the airline. *Id.* at 1173–74; *cf. Hermano, supra; Chendrimada v. Air–India* (S.D.N.Y.1992) 802 F.Supp. 1089, 1092 (upholding the plaintiffs' claim predicated on allegations of weakness, nausea, cramps, and malnutrition because the plaintiffs suffered these injuries as a direct result of their confinement on a grounded airplane for over eleven hours without food; thus,

their symptoms had an independent physical genesis and were not merely psychosomatic); *Ratnaswamy v. Air Afrique* (N.D.Ill. Mar. 3, 1998) 1998 WL 111652, at * 5–6, No. 95 C 7670, 1998 U.S. Dist. LEXIS 2683, at *18–21 (although "seemingly a very difficult task," if plaintiffs can prove that they experienced their nausea and diarrhea as a direct result of the defendant's delay in transportation, and not simply because of stress due to such delay, then they may sue under the Convention).

■ Applying the above analysis to the case at bar, we find that plaintiff should take nothing by virtue of any events happening on the plane or during "disembarkment" (as defined below) since her physical symptoms from such events arose solely from her emotional distress, as opposed to having an independent physical genesis in the "accident" itself. Here, the "accident" included Continental's act of delaying the return of the plane to the gate and its employees' comments directed to plaintiff and to fellow passengers. To the extent that plaintiff throughout her ordeal did not receive any physical wounds, impacts, or deprivations, or any alteration in the structure of an internal organ, then any subsequent shortness of breath, sleeplessness, or inability to concentrate may safely be characterized as psychosomatic and is not compensable.

■ We have considered *sua sponte* whether for purposes of this motion we may accept that the accident proximately caused plaintiff to develop chronic post-traumatic stress disorder (PTSD). In two recent lawsuits, victims of chronic PTSD have tendered evidence that it constitutes a physical injury to the brain. New technology has allowed doctors to perceive that extreme stress, such as a near-death experience or being taken hostage, can actually change brain cell structure and cause a specific area of the brain to atrophy. Although not every PTSD patient will display the same biological abnormalities, objective evidence exists in some cases that

brain damage has ensued. *In re Air Crash at Little Rock, Ark.* (E.D.Ark.2000) 118 F.Supp.2d 916, 917–19, 924; *Weaver v. Delta Airlines, Inc.* (D.Mont.1999) 56 F.Supp.2d 1190.

■ According to *Floyd*, bodily injury encompasses "a change in the structure of an organ," 499 U.S. at 541, 111 S.Ct.· 1489, and the brain's physical architecture can transform during PTSD. Although the American Psychiatric Association still classifies PTSD as a mental disorder, that classification is not dispositive, and we acknowledge that under some circumstances a diagnosis of chronic PTSD may fall within the Convention's definition of "bodily injury."

Nevertheless, the instant plaintiff has not adequately plead PTSD to survive a motion for summary judgment. Granted, she mentions "post traumatic stress" in her interrogatory responses and describes herself as "shell shocked" after her subjective experience of doom onboard the aircraft. However, we have insufficient evidence before us that her psychiatrist rendered that diagnosis. Rather, we observe Dr. Orlate's diagnosis of acute stress disorder, which illness, although it sometimes leads to PTSD, differs from that latter syndrome in significant ways.

Thus, the case at bar parallels others in which plaintiffs have not advanced with the requisite specificity either a brain-lesion theory of PTSD or individualized proof of such lesions. In *Terrafranca, supra,* the plaintiff did not receive compensation, even though she had been diagnosed with PTSD. The plaintiff "apparently did not allege that PTSD was a physical manifestation of injury. Instead, she relied on her loss of weight as the physical manifestation of injury." *Little Rock*, 118 F.Supp.2d at 924–25. Moreover, Terrafranca's own psychiatrist "described her injuries as emotional." *Terrafranca*, 151 F.3d at 112.

Similarly, the plaintiff in a recent case in this District presented a diagnosis of PTSD along with slight bruising, sexual dysfunction, and panic attacks after an emergency evacuation, but the Court never considered PTSD as an independent bodily injury because the parties did not properly spotlight the issue. *See Alvarez v. American Airlines, Inc.* (S.D.N.Y. Sept. 7, 1999) 1999 WL 691922, at *1, No. 98 Civ. 1027, 1999 U.S. Dist. LEXIS 13656, at *2–3, 15; *cf., e.g., Curley v. American Airlines, Inc.* (S.D.N.Y.1994) 846 F.Supp. 280, 282 (Knapp, J.) (accepting that Article 17 excludes "purely psychological" injury, in suit alleging PTSD; questions concerning "bodily injury" not reached because incident did not meet Convention's definition of "accident").

We recognize that the "floodgates of litigation" might open unless courts carefully scrutinize claims of PTSD to ensure that litigants do not tack such claims onto complaints simply to avoid immediate dismissal. *Cf. Weaver*, 56 F.Supp.2d at 1192. Plaintiffs in all of the reported PTSD cases seem to have lived through *objectively* very traumatic events. On the other hand, we may question whether, for example, Ms. Tseng, who testified that she felt "traumatized" and "raped," and whose symptoms persisted for more than one month, was a victim of PTSD. While a female security officer had extensively touched Tseng through her clothing, that trauma is minor compared with the anticipation of imminent, fiery extinction. An analogous concern compels us not to overstep the bounds of prudence in the case at bar, where plaintiff has not proffered reliable evidence beyond her purely subjective experience of panic, a number of somatic complaints (not even mentioned in the original complaint) that do not necessary augur chronic PTSD, and conflicting diagnoses of non-PTSD illnesses.[4]

4. Incidentally, many district court opinions and commentators have dealt with the situation where a passenger suffered some (even if very minor) physical injury and also extreme psychological injury during or as a result of the voyage. The question expressly left unanswered by *Floyd* is whether Article 17 ever allows compensation for psychological injury,

## II. PREEMPTION

■ Due to the doctrine of preemption, we immediately dismiss some of the causes of action against Continental. The Supreme Court in 1999 pronounced that, "given the Convention's comprehensive scheme of liability rules and its textual emphasis on uniformity" throughout the signatory nations, the Convention "precludes a passenger from maintaining an action for personal injury damages under local law [even] when her claim does not satisfy the conditions for liability under the Convention." *Brandt v. American Airlines* (N.D.Cal. Mar. 13, 2000) No. C 98–2089 SI, 2000 WL 288393, at * 4, 2000 U.S. Dist. LEXIS 3164, at *11 (quoting *Tseng*, 119 S.Ct. at 671–72, 674–75). "Local" law certainly includes federal statutes such as plaintiff's discrimination claim under the Air Carrier Access Act ("ACAA"), 49 U.S.C. § 41705, as well as her state tort claims. *See Brandt*, 2000 WL 288393, at *4–6, 2000 U.S. Dist. LEXIS 3164, at *14–23 (dismissing claims for ACAA violations, defamation, and intentional and negligent infliction of emotional distress); *see also, e.g., Hermano*, 1999 WL 1269187, at *5–6 (citing Art. 25 of the Convention as amended by Montreal Protocol No. 4) (defamation and other wilful or reckless wrongdoing subsumed under the Convention's realm).

■ Plaintiff argues that Congress has demonstrated a desire to apply the ACAA regardless of the treaty's limitations. We disagree. A treaty "will not be deemed to have been abrogated or modified by a later statute unless such purpose on the part of Congress has been clearly expressed." *Trans World Airlines, Inc. v. Franklin Mint Corp.* (1984) 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 (quoting *Cook v. United States* (1933) 288 U.S. 102, 120, 53 S.Ct. 305, 77 L.Ed. 641). Although Congress recently amended the ACAA to add "foreign air carrier[s]" to its purview, Congress expressly did so "subject to [49 U.S.C.] § 40105(b)," which cited section declares that the executive branch "shall act consistently with obligations of the United States Government under an international agreement." *See* Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (Apr. 5, 2000) Pub.L. No. 106–181, 114 Stat. 61 (codified at 49 U.S.C. § 41705(a) (Supp. Sept. 2000)).[5] The amendment's legislative history notes that the change "extends the existing prohibition on discrimination to foreign airlines operating to the United States *subject to bilateral obligations* under § 40105(b)." H.R. Conf. Rep. No. 106–513, 2000 U.S.C.C.A.N. 80, § 128 (emphasis added). Hence, Congress, in extending protection to travelers on foreign carriers, manifestly did not intend to rescind components of a crucial and longstanding treaty.

Plaintiff expresses concern that, if all federal and state anti-discrimination laws are preempted, domestic airlines will escape all punishment for egregious acts of discrimination on their international flights. However, an act of discrimination

and if so, whether plaintiffs must show a causal connection between their physical and psychological damages. *See generally* Max Chester, Comment, *The Aftermath of the Airplane Accident: Recovery of Damages for Psychological Injuries Accompanied by Physical Injuries under the Warsaw Convention* (2000) 84 Marq. L.Rev. 227, 233–45 (reviewing cases); Jean–Paul Boulee, Note, *Recovery for Mental Injuries That Are Accompanied by Physical Injuries Under Article 17 of the Warsaw Convention* (1995) 24 Ga. J. Int'l & Comp. L. 501. The majority rule emerging from these precedents dictates that a plaintiff must demonstrate such a causal connection between the alleged physical injury and any alleged psychological injury. *See Alvarez*, 2000 WL 288393, at *3–5, 1999 U.S. Dist. LEXIS 13656, at *9–15. As a matter of sound policy and sound interpretation of controlling law, we find laudable the restraint that the majority rule imposes upon plaintiffs' psychosomatic claims in Warsaw Convention actions.

5. The case law has construed the ACAA to provide an implied private cause of action. *See Tallarico v. Trans World Airlines, Inc.* (8th Cir.1989) 881 F.2d 566, 568–70.

may, under certain circumstances, qualify as an "accident" under the Convention and lead to legal sanctions. Moreover, the Convention massively curtails damage awards for victims of horrible acts such as terrorism; the fact that the Convention also abridges recovery for the lesser offense of discrimination should not surprise anyone.

 In any event, an air carrier remains "indisputably subject to liability under local law" for passenger injuries occurring *after* "disembarking" has already taken place. *Tseng*, 525 U.S. at 172, 119 S.Ct. 662. Hence, any acts or omissions of Continental while plaintiff sat on the plane or during her "disembarkment" can result in liability, if any, only under the Convention. In contrast, plaintiff may still sue Continental under other laws (namely, defamation, intentional infliction of emotional distress, and conspiracy to commit false imprisonment) for its alleged comments to officials after it released plaintiff into such officials' custody in the public area of the terminal. (See Part III, *infra*.)

This analysis impels us to dismiss in their entirety the following of plaintiff's causes of action against Continental:

- common law false imprisonment claim for refusing plaintiff permission to deplane;
- defamatory remarks communicated to passengers onboard the airplane; and
- discrimination under the ACAA.

Additionally, we must dismiss any claims (defamation, intentional infliction of emotional distress) based upon communications that the pilot made to the police. These conversations took place before plaintiff left the plane.

## III. "DISEMBARKING"

As recorded above, though, liability under the Convention ends once "disembarkation" ends. (Article 17 requires that a passenger's damage be sustained "in the course of any of the operations of . . . dis-

embarking.") Consequently, plaintiff may sue under other federal or state law for torts committed by Continental after she had fully disembarked.

 In construing the phrase "operations of embarking and disembarking," the Second Circuit has adopted a tripartite evaluation that examines:

- Where the plaintiff was when the accident occurred ("location");
- What the plaintiff was doing ("activity"); and
- At whose direction the plaintiff was acting ("control").

*See, e.g., Alleyn v. Port Authority of N.Y.* (E.D.N.Y.1999) 58 F.Supp.2d 15, 20 (citing *Day v. Trans World Airlines, Inc.* (2d Cir.1975) 528 F.2d 31, 33, *cert. denied*, 429 U.S. 890, 97 S.Ct. 246, 50 L.Ed.2d 172 (1976)).

Most cases have narrowly construed the phrase, denying most accidents the coverage of the Convention. *Id.* The courts have proved less likely to find coverage when the passenger has already entered a public (non-restricted) area of the terminal and becomes free to set his or her "own pace, direction, and course of travel." *See id.* at 20–21 (citing cases).

In one lawsuit, despite the presence of airline personnel assisting arriving passengers, the Court found that such passengers had ceased disembarking because the "mere" assistance of passengers off the plane and towards customs did not control or direct their behavior. *Curran v. Aer Lingus* (S.D.N.Y.1982) 17 Av. Cas. (CCH) ¶ 17,560, 1982 U.S. Dist. LEXIS 15937, at *5–7, *aff'd mem.*, 729 F.2d 1443 (2d Cir. 1983). There, the "plaintiff's movement was undeniably restricted at the time he was injured. The restrictions placed on him, however, were imposed by customs, not [by the defendant airline]." *Id.* at *6–7; *see also, e.g., Knoll v. Trans World Airlines, Inc.* (D.Colo.1985) 610 F.Supp. 844, 847.

**182**

In the case at bar, crucial acts took place *after* "disembarking." Alleged conversations between Continental agents and the police led to plaintiff's involuntary conveyance to the psychiatric emergency room. These conversations, which form the basis for several causes of action,[6] happened after plaintiff had already been delivered into the hands of the police and a medical team. True, Continental employees stood by and spoke with these other officials. At that point, however, the police (and perhaps also the medical team)—and not Continental—controlled plaintiff's movements. Moreover, these communications apparently transpired in a waiting area of the terminal, rather than in a restricted area used only for the exiting of a particular airplane. The defendants did not speak among themselves about any process of deplaning. Instead, they spoke about plaintiff's behavior and symptoms.

Overall, the relevant factors—location, activity, and most importantly, control—all confirm that plaintiff had fully disembarked before Continental employees (excepting the pilot) could have conspired with the police to have her detained in a mental hospital. Consequently, the Warsaw Convention does not preempt legal action for allegedly false and vindictive statements made to the police by Continental in the terminal waiting area.

Continental ingeniously argues that at the moment the police took custody of plaintiff, Continental's influence and thus any alleged liability simultaneously stopped. That does not follow. While plaintiff remained under police control, Continental representatives could still in theory have lied to the police in order to influence them to institutionalize her. Plaintiff has sufficiently alleged facts to support such a theory. Further discovery may elucidate exactly why Port Authority personnel took plaintiff to the Medical Center and whether Continental agents improperly corrupted that decision.

6. Federal and state constitutional violations for false arrest and imprisonment; intentional

*CONCLUSION*

For the foregoing reasons, we:

● GRANT plaintiff leave to amend her complaint within fourteen days to allege causes of action consistent with this opinion and to consolidate her two cases pending before us pursuant to Fed.R.Civ.P. 42(a);

● GRANT IN PART AND DENY IN PART Continental's motion insofar as we dismiss the preempted claims enumerated in Part II above but otherwise deny the motion.

**SO ORDERED.**

infliction of emotional distress; and defamation.