John J. WATERS, Plaintiff,

v.

The PORT AUTHORITY OF NEW YORK & NEW JERSEY, Alitalia Airlines, Continental Airlines, Josephine Tyburski, ABC Corporation A–M (names being fictitious), ABC Corporation, N–Z (names being fictitious), John Does 1–10, Jane Does 1–10, Defendants.

No. CIV A 98–5794 WHW.

United States District Court, D. New Jersey.

Aug. 14, 2001.

---

Mark Gertner, Freeman and Gertner, P.C., South Orange, NJ, Attorneys for Defendants.

Patricia Moores, Eugene Massamillo, Biedermann, Hoenig, Massamillo & Ruff, P.C., New York, NY, Attorneys for Defendants.

Carmen E. Mendiola, Law Offices of Carmen E. Mendiola, Jersey City, NJ, Attorney for Plaintiff.

## AMENDED OPINION

WALLS, District Judge.

Defendants Alitalia Linee Aeree Italiane S.p.A. ("Alitalia"), Continental Airlines ("Continental"), Josephine Tyburski ("Tyburski"), and the Port Authority of New York and New Jersey ("PATH") (collectively, "defendants") move for summary judgment on all counts of the First Amended Complaint. Pursuant to Fed. R.Civ.P. 78, this motion is decided without oral argument and is granted.[1]

### BACKGROUND

Plaintiff John J. Waters ("Waters") seeks to recover damages for injuries allegedly sustained in connection with his transportation aboard Alitalia Flight 611 from JFK to Rome, Italy on December 22, 1997, and his return flight home on Alitalia Flight 610 on January 3, 1998. He also seeks injunctive relief to prevent Continental and Alitalia from engaging in discriminatory conduct in the future. Plaintiff, who uses a wheelchair because of his multiple sclerosis, alleges that defendants (1) failed to provide him with proper "meet and assist" services when he boarded Flight 611; (2) failed to assign him a bulkhead seat aboard Flight 611; and (3) failed to transfer him from his seat to a transfer

---

1. This opinion is identical in substance to the original opinion dated August 6, 2001, except the Court's characterization of defendant Josephine Tyburski as "Continental's" representative has been corrected to read "Alitalia's" representative on page six. The Court has also inserted the missing word "case" at the bottom of page 26, which was omitted in the original opinion, and corrected the spelling of the word "circumstances" on page 35. In addition, the Opinion is amended to indicate that it has been submitted for publication.

chair upon his arrival in New York on Flight 610.

Plaintiff flew from JFK to Rome, Italy on Alitalia Flight 611 in December 1997. Plaintiff traveled with his sister, Kelly Waters, his brother-in-law, and a family friend. He was issued a Continental ticket for this trip through the redemption of his sister's Continental One–Pass miles. Plaintiff states that when he checked in for the flight, he requested bulk head seats and assistance in boarding the aircraft, because he is in a wheelchair and is unable to walk or stand. According to plaintiff, the agent informed him that he and his family members were assigned three bulk head seats and that plaintiff would receive assistance to board the aircraft. Defendants do not dispute this fact. Plaintiff and his family pre-boarded flight 611.

Plaintiff testified at his deposition that he was met at the gate and wheeled through the jetway by an individual he believed to be an Alitalia gate agent. At the aircraft door, he was met by two unidentified individuals with a transfer chair. Plaintiff claims that the two individuals refused to transfer plaintiff from his wheelchair to the transfer chair. His family members moved him from his wheelchair onto the transfer chair in the jetway immediately outside the door to the aircraft. Once on the transfer chair, the two individuals wheeled plaintiff to what defendants claim was plaintiff's assigned seat. Plaintiff asserts that he informed the two individuals that he was assigned a bulkhead seat and not the seat three-quarters of the way into the cabin where he was wheeled. Plaintiff further asserts that the two individuals then told him that he had to transfer himself to the seat that was assigned to him. Plaintiff states he advised the two individuals that he was unable to transfer by himself and that he was physically unable to sit in the assigned seat.

Plaintiff does not present any evidence that the seat to which he was wheeled was not actually the seat listed on his boarding pass, notwithstanding what he had been told by the gate agent.

According to plaintiff, one of the two individuals then stated that he was going to find out about the bulkhead seat. That individual left and did not return. The other man stayed with plaintiff for five minutes and then left. Plaintiff states that he was left unattended in the aisle of the plane for about 20–25 minutes, strapped to the transfer chair. Defendants, however, claim that plaintiff refused to allow the meet and assist services men to transfer him to his assigned seat when he did not hold a boarding pass for a bulkhead seat. They further claim that at plaintiff's own insistence, plaintiff waited in the aircraft aisle for 20–25 minutes while his seat assignment was debated. Plaintiff claims that none of the flight attendants nearby offered him any assistance. Instead, other passengers were permitted to board the flight while plaintiff remained in the aisle. Plaintiff claims that he was unattended and unable to move, and that other passengers who attempted to pass him bumped into him, hitting him with their bags and causing him to fear that he might fall out of the transfer chair. After passengers began to board, plaintiff's family members moved plaintiff from the transfer chair to an aisle seat in one of the bulk head rows. Plaintiff and his sister both testified that plaintiff and his family were afraid that he would be injured if he remained in the aisle. Plaintiff's family members took the two seats next to plaintiff in the bulkhead row.

At some point, Alitalia's station manager at JFK, defendant Josephine Tyburski, was summoned onto the flight to handle the alleged seating dispute. Tyburski had the responsibility to assist individuals with

disabilities in boarding a flight. According to plaintiff, Tyburski informed him that he had to move his seat, and he responded that he was unable to move. Defendants claim that plaintiff refused to move from his bulkhead seat. The passengers originally assigned to the seats in plaintiff's row sat in other seats. According to defendants, plaintiff testified he had only the following exchange with Tyburski:

> Miss Tyburski approached me in a very angry frame of mind. And she instructed me, that's not your seat, move. My response was, move me. And she looked at me and turned around in a huff and said, well, now I have to write a letter. And that was the last I spoke with her.

Plaintiff Dep. Tr., at p. 46.

Plaintiff remained in the bulkhead seat for the rest of the flight. Plaintiff contends that during the flight, no flight attendant apologized to him for the incident, although several Alitalia employees approached plaintiff's sister to inquire whether she was alright.

Plaintiff also contends that when he returned home on Alitalia flight 610 on January 3, 1998, plaintiff was one of the last people on the flight to exit the aircraft. He claims that two unidentified individuals boarded the plane with a transfer chair but did not know how to transfer him from the aircraft seat onto the transfer chair. He testified that his sister and brother-in-law then transferred him from the aircraft seat onto the transfer chair. Again, when he arrived in the jetway, the two individuals did not know how to transfer him back to the wheelchair, so his sister and brother-in-law transferred him from the transfer chair onto the wheelchair. According to defendants, Flight 610 transpired without incident, because plaintiff testified that he was provided meet and assist services in New York, was provided with a transfer chair, and agreed that the flight transpired without incident.

Plaintiff claims that as a result of these incidents, he sustained "mental and emotional anguish and distress, indignity, embarrassment and humiliation" and was "smacked in the head with carry-on bags" and coats while waiting in the aisle. *See* Compl., at ¶ 44. In his answers to interrogatories, plaintiff claims the following:

> ... physical, mental and emotional anguish, emotional distress, stress, anxiety in flying, loss of sleep for a period of 23 days, constipation for a period of 12 days, loss of weight, exacerbation of his multiple sclerosis.

Plaintiff's Answers to Alitalia's First Set of Interrogatories, No. 6. According to defendants, Plaintiff testified at his deposition that he was not injured as a result of any incident on Flight 611 and sought no medical attention for his head. He did testify that he visited a nurse at the suggestion of a relative to make sure everything was normal, which it was. However, plaintiff also testified he suffered constipation for 12 days and experienced anxiety in flying, sleep loss for 12 days and loss of weight for twelve days while on vacation. Furthermore, he stated he experienced an exacerbation of his multiple sclerosis symptoms, in that his upper body strength became weaker. *See* Plaintiff Dep., at 62:7–63:9. However, plaintiff also testified that he never discussed with his physician whether his experience aboard flight 611 was in any way connected to his loss of upper body strength. *Id.* at 65:1–5.

He further claims that Continental is responsible for this incident because it operated a "code-share" arrangement with Alitalia. Plaintiff testified that he personally never dealt with anyone at Continental with regard to his trip. His sister, Kelly Waters, made plaintiff's travel arrangements. Ms. Waters testified that she

spoke with Continental to transfer her One–Pass miles to use on the trip to Rome. She also testified that she spoke with a Continental representative named "Chico" in August 1997 to make a reservation for the plaintiff. Alitalia's representative, Josephine Tyburski, testified that Continental has no operations at JFK, did not operate Alitalia Flight 611 or 610 and did not have a code share agreement with Alitalia for any flights originating at JFK. A code share agreement produced in discovery indicates that such an arrangement existed between Continental and Alitalia but that JFK was not designated among the routes in the agreement. Continental claims that had plaintiff been on a code share flight, his ticket would reflect a Continental flight number, not an Alitalia flight number, as it did here. Accordingly, Continental maintains that its only involvement in the flights was to allow plaintiff's sister to redeem her frequent flyer miles to issue a round-trip ticket for her brother from New York to Italy. Plaintiff responds that it is irrelevant that he erroneously referred to the contract between Alitalia and Continental as a "code-share" agreement, and states that Continental's liability stems from Continental's contractual relationship with Alitalia, which allowed plaintiff to travel on Alitalia flights using a Continental ticket and Continental One–Pass miles.

Plaintiff named PATH as a defendant, and claims that it had an obligation to provide him the "meet and assist" services at JFK International Airport. According to defendants, PATH leases space at the airport from New York City and leases it to airlines. Defendants assert that PATH was only a landlord for the airport and at no time was it required to provide or did provide meet and assist services to Alitalia passengers. Defendants argue that Kelly

Waters testified that there were two "unidentified individuals" that were supposed to assist John with the transfer. She did not know whether they were employed by PATH and did not have any conversations with anyone else who she believed to be employed by PATH. Other than this testimony, defendants argue that there is no evidence that has been adduced to demonstrate that PATH employed the two "unidentified individuals." Plaintiff argues that it is without a basis to dispute this fact because PATH has failed to produce discovery. According to plaintiff's counsel, she discovered that on May 13, 1997, PATH turned over the operation of the international arrivals building to a consortium called Schipol/ IAT. Counsel claims that contrary to this, PATH's counsel had represented that a lease existed between Alitalia and PATH, which plaintiff's counsel avers is not true. In addition, plaintiff's counsel claims that discovery in January of this year revealed that PATH is not merely the owner of property with no involvement in the daily operations of carriers who lease the property, contrary to previous assertions by PATH's counsel. Plaintiff's counsel further contends that plaintiff has not been provided information as to the agreement between PATH and Schipol/IAT or between Schipol/IAT and Alitalia. Counsel does not describe, however, any specific information she has that PATH had some involvement in the "meet and assist services."

Plaintiff argues that it is disputed who actually provided the meet and assist services. Plaintiff states that Tyburski testified that in December of 1997, a third party, Dynair, provided all of Alitalia's "ground handling services," including meet and assist services. However, she later testified that it could have been a company called "Summit Security" or "Triangle Ser-

vices."[2]

## DISCUSSION

### Standard for Summary Judgment

"[S]ummary judgment is proper 'if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986) (quoting Fed. R.Civ.P. 56(c)). In deciding a motion for summary judgment, the Court must construe the facts and inferences in a light most favorable to the non-moving party. *Pollock v. American Tel. & Tel. Long Lines*, 794 F.2d 860, 864 (3d Cir.1986). The role of the court is not "to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A genuine issue of material fact exists only if the evidence presented would enable a reasonable jury to return a verdict for the non-movant. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. Summary judgment must be granted if no reasonable trier of fact could find for the nonmoving party. *See id.* at 249, 106 S.Ct. 2505.

To defeat summary judgment, an issue of fact in dispute must be one which a reasonable factfinder could base a verdict for the non-moving party and one which is essential to establishing the claims. *See Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. The non-moving party may not defeat summary judgment by simply resting on the argument that the record contains fact sufficient to support his claims. *See Big Apple BMW, Inc. v. BMW of North America, Inc.*, 974 F.2d 1358, 1362 (3d Cir.1992), *cert. denied*, 507 U.S. 912, 113 S.Ct. 1262, 122 L.Ed.2d 659 (1993); *O'Donnell v. U.S.*, 891 F.2d 1079, 1082 (3d Cir.1989). Rather, the non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324, 106 S.Ct. 2548; Fed.R.Civ.P. 56(e). "[C]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment." *Olympic Junior, Inc. v. David Crystal, Inc.*, 463 F.2d 1141, 1146 (3d Cir. 1972); *see also First Nat'l Bank of Arizona v. Cities Service Co.*, 391 U.S. 253, 288–290, 88 S.Ct. 1575, 20 L.Ed.2d 569 (1968); *Gostin v. Nelson*, 363 F.2d 371 (3d Cir.1966).

## I. Preemption of State Law Claims by the Warsaw Convention of 1929

◼ As stated, plaintiff asserts state law claims of negligence against all defendants, assault and battery against defendants Alitalia and Port Authority, and seeks punitive damages against all defendants. Defendants maintain that all of plaintiff's claims are preempted by the Warsaw Convention of 1929 ("Warsaw Convention" or the "Convention")[3], based upon the Supreme Court's decision in *El Al Israel Airlines, Ltd. v. Tseng*, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999), and its progeny. In *Tseng*, the Supreme Court

---

**2.** The Magistrate Judge denied plaintiff's motion to file an amended complaint to name several other defendants, including Schipol/IAT, Dynair, Summit Security and Triangle Services, as well as a motion for reconsideration of that decision.

**3.** The full title of the Convention is The "Convention for the Unification of Certain Rules Relating to International Transportation by Air, Oct. 12, 1929," codified at 49 Stat. 3000, T.S. No. 876 (1934), *reprinted in* note following 49 U.S.C. § 40105.

declared that "recovery for a personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' ... *if not allowed under the Convention, is not available at all.*" 525 U.S. at 161, 119 S.Ct. at 668 (emphasis added). Plaintiff distinguishes *Tseng* and argues that the Convention should not be interpreted to preempt plaintiff's federal causes of action for discrimination, but plaintiff does not dispute defendant's arguments that plaintiff's state law claims are also barred. As defendants observe in reply, plaintiff appears to concede the preemption of his state law claims. Even if plaintiff did not concede preemption of state law claims, this Court determines independently that the state law claims against Alitalia, and claim for punitive damages, to the extent it arises from plaintiffs' state law claims, are barred by the Warsaw Convention, because the Convention provides the exclusive cause of action for injuries suffered during international flights. *Tseng*, 525 U.S. at 161, 119 S.Ct. at 668; *Grimes v. Northwest Airlines, Inc.*, No. CIV. A. 98–CV–4794, 1999 WL 562244 (E.D.Pa. July 30, 1999), *aff'd*, 216 F.3d 1076 (3d Cir.), *cert. denied*, 531 U.S. 879, 121 S.Ct. 190, 148 L.Ed.2d 132 (2000). Moreover, the preemption of plaintiff's state law claims extends to the other defendants, because those claims are asserted against the other defendants only insofar as they may be characterized as acting as agents of Alitalia.[4] *See Croucher v. Worldwide Flight Services, Inc.*, 111 F.Supp.2d 501, 503, 505 (D.N.J.2000) (the term "carrier" as used in the Warsaw Convention includes any employees of the carrier, as well as agents and contractors who performed services

"in furtherance of the contract of carriage").

Accordingly, plaintiff's claims of negligence and assault and battery are preempted by the Warsaw Convention, and summary judgment is granted to defendants on Counts I and IX.

## II. Preemption of Federal Discrimination Claims By the Warsaw Convention of 1929

What is less clear is whether the Convention also preempts federal causes of action such as plaintiff's federal discrimination claims under the Federal Aviation Act ("FAA") and the Air Carrier Access Act ("ACAA"), and accompanying regulations. A discussion of the Convention's language, history and purposes, and the Supreme Court's reasoning in *Tseng* is helpful to understand whether those claims are also preempted.

By its terms, the Warsaw Convention applies to "all international transportation of persons, baggage or goods performed by aircraft for hire." 49 Stat. 3014, Art. 1(1). The Convention defines "international transportation" to include, among other things, transportation between two contracting signatory nations. *Id.* at Art. 1(2). Both the U.S. and Italy have adopted the Convention.

Article 17 of the Convention provides:

> The carrier shall be liable for damage sustained in the event of the death or wounding of a passenger or any other bodily injury suffered by a passenger, if the accident which caused the damage so sustained took place on board the aircraft or in the course of any of the

---

4. As discussed later, the parties heavily over defendants PATH and Continental were in fact agents of Alitalia, but that dispute is irrelevant in the determination of preemption be-

cause plaintiff seeks to hold those defendants liable for negligence and assault and battery only to the extent they acted as Alitalia's agents.

operations of embarking or disembarking.

49 Stat. 3018. When an event in international flight is covered by Article 17, a passenger may recover under the convention when he or she establishes "(1) an accident has occurred, in which (2) a passenger suffered death, wounding, or any other bodily injury, and (3) the accident occurred either on board the aircraft or in the course of embarking or disembarking from the plane." *Tseng v. El Al Airlines, Ltd.*, 122 F.3d 99, 102, *rev'd on other grounds*, 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576; *see also Eastern Airlines, Inc. v. Floyd*, 499 U.S. 530, 535–536, 111 S.Ct. 1489, 1493–94, 113 L.Ed.2d 569 (1991).

The original language of Article 24 of the Convention instructed:

(1) In the cases covered by articles 18 and 19 any action for damages, however founded, *can only be brought subject to the conditions and limits set out in this convention.*

(2) In the cases *covered by article 17* the provisions of the preceding paragraph shall also apply, without prejudice to the questions as to who are the persons who have the right to bring suit and what are their respective rights.

49 Stat. 3020 (emphasis added).[5] Although not a "model of the clear drafter's art," *Tseng*, 525 U.S. at 167, 119 S.Ct. 662, this article of the Convention has been interpreted to meant that any situation "covered" by Article 17 of the Convention must be brought within the limits enunciated by the Convention. What was uncertain before the Supreme Court's decision in *Tseng* is what it means to be "covered" by Article 17:

> One plausible reading of Article 17 is that the Convention "covers" only cases of injury caused by accidents that take place after the passenger has begun the process of embarking and before the process of disembarking is complete. . . .
>
> However, an alternative plausible construction is that Article 17 "covers" all cases of injury, but merely limits carrier liability to cases of injury caused by accidents that occur after the passenger has begun the process of embarking and before the process of disembarking is complete.

Robert Coleman, *I Saw Her Duck: Does Article 17 of the Warsaw Convention "Cover" Injuries or Accidents?*, 7 Geo. Mason L.Rev. 191, 193 (1998). Under the first interpretation, Article 24(2) would not bar recovery under alternative theories such as state tort law for someone who suffered an injury, but not in the course of an "accident." Under the second interpretation, Article 24(2) would prevent recovery under state law theories for any injuries whatsoever if they were uncompensable under the Convention. *See id.* Similarly, the interpretation given to the term "covered" would affect plaintiffs' ability to re-

---

**5.** Articles 18 and 19 of the Convention establish conditions of liability for damage to baggage or goods and for damages caused by delay, respectively. *See* 49 Stat. 3019. Chapter III of the Convention, entitled "Liability of the Carrier," defines in Articles 17, 18, and 19 the three different kinds of liability provided for by the Convention.

Other provisions in Chapter III govern limitations on liability. For example, a carrier is relieved of liability under Article 20 if it has "taken all necessary measures to avoid the damage." 49 Stat. at 3019. Article 22 sets monetary limits on a carrier's liability for harm to passengers and baggage. *Id.* Article 23 invalidates contractual provisions that would reduce liability below that set forth in the Convention. *Id.* at 3020. Article 25(1) renders the Convention's limits on liability if the damage is caused by a carrier's "wilful misconduct." *Id.*

cover under state tort theories even when recovery is available under the Convention. *See id.* at 197.

Before the Supreme Court granted certiorari in *Tseng,* three federal courts of appeals were divided as to the correct interpretation of Article 17. *See Tseng,* 525 U.S. 155, 161 n. 3, 119 S.Ct. 662, *comparing Abramson v. Japan Airlines Co.,* 739 F.2d 130, 134 (3d Cir.1984) (Warsaw Convention does not preclude passengers from bringing suits under local law when the passengers are unable to recover under the Convention), *cert. denied,* 470 U.S. 1059, 105 S.Ct. 1776, 84 L.Ed.2d 835 (1985), *with Potter v. Delta Air Lines, Inc.,* 98 F.3d 881, 885 (5th Cir.1996) (holding the Convention creates the exclusive cause of action against international air carriers for personal injuries that arise from international air travel); and *citing Krys v. Lufthansa German Airlines,* 119 F.3d 1515, 1518 n. 8 (11th Cir.1997) (recognizing the split).

In 1998, the United States ratified Montreal Protocol No. 4 (the "Montreal Protocol" or the "Protocol"), which was signed in Montreal in 1975 and amended the Warsaw Convention. 144 Cong. Rec. S11059 (daily ed. Sept. 28, 1998). The Protocol became effective in the United States on March 4, 1999. The Protocol deleted the original Article 24 and replaced it with the following requirement:

> In the carriage of passengers and baggage, *any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention,* without prejudice to the question as to who are the persons who have the right to bring suit and what are their respective rights.

Montreal Protocol No. 4 to Amend the Convention for the Unification of Certain Rules Relating to International Carriage by Air, *reprinted in* S. Exec. Rep. No. 105–20, at 29 (1998) (emphasis added).

■ When transportation is "international" as defined in Article 1(2), the provisions of the Warsaw Convention exclusively govern the rights of the parties to an action for damages and preempt all other causes of action. *See El Al Israel Airlines, Ltd. v. Tseng,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). In *Tseng,* a passenger who was traveling to Israel was subjected to an intrusive security search at the airport by an El Al security officer after giving "illogical" answers to certain routine security questions. *Tseng v. El Al Israel Airlines, Ltd.,* 122 F.3d 99, 101 (1997), *rev'd,* 525 U.S. 155, 119 S.Ct. 662, 142 L.Ed.2d 576 (1999). Although she was allowed to board the flight after a determination she was not a security risk, Tseng later brought suit against the airline, claiming she had been emotionally traumatized by the search and required professional psychiatric treatment upon return to New York. *Id.* Plaintiff alleged a state law personal injury claim arising from assault and false imprisonment and a property claim for lost or stolen property. *Id.* El Al removed to federal court, then asserted that plaintiff's action was governed by the Warsaw Convention. *Id.*

■ The district court ruled that plaintiff's claims were governed by the Convention and found that the airline's search of plaintiff was an "accident" within the meaning of Article 17 of the Convention. *Id.* It also found she had failed to establish a physical injury as required by Article 17 and thus could not recover under Article 17. The district court further held that plaintiff could not pursue her claim alternatively under New York tort law, because it read Article 24 to "shield[ ] the carrier from liability for personal injuries not compensable under Article 17." *See Tseng,* 525 U.S. at 164, 119 S.Ct. 662, citing

*Tseng*, 919 F.Supp. at 158. Plaintiff appealed the dismissal of her personal injury claim. The Second Circuit reversed in part, holding that no "accident" had occurred within the meaning of Article 17. Because the Circuit found her personal injury claim was outside the scope of Article 17—*i.e.*, not "covered" by it—that court declared that plaintiff could bring a state law claim against El Al. *See id.* at 104–105, 108. The Circuit supported this conclusion by stating that Article 24 of the Convention "clearly states that resort to local law is precluded only where the incident is 'covered' by Article 17, meaning where there has been an accident, either on the plane or in the course of embarking or disembarking, which led to death, wounding or other bodily injury." 122 F.3d at 104–105. The Circuit construed the drafting history to "indicate that national law was intended to provide the passenger's remedy where the Convention did not expressly apply." *Id.* at 105.

The Supreme Court granted certiorari, after previously declining to address the issue of whether the Convention " 'provides the exclusive cause of action' for injuries sustained during international air transportation." *Tseng*, 525 U.S. at 162, 119 S.Ct. at 668, quoting *Eastern Airlines v. Floyd*, 499 U.S. 530, 553, 111 S.Ct. 1489, 113 L.Ed.2d 569 (1991).[6] In view of the split among the circuits and the Second

Circuit's holding in *Tseng*, the Court determined this issue was ripe for review.

The Supreme Court reversed, holding that "recovery for personal injury suffered 'on board [an] aircraft or in the course of any of the operations of embarking or disembarking,' ... *if not allowed under the Convention, is not available at all.*" 525 U.S. at 161, 119 S.Ct. 662 (emphasis added).[7] The Court stated that "recourse of local law ... would undermine the uniform regulation of international air carrier liability that the Warsaw Convention was designed to foster." *Id.* First the Court explained the traditional canons of treaty construction which require a court to: (1) consider the text of the treaty; (2) give meaning to the words " 'consistent with the shared expectations of the contracting parties,' " and (3) use the "negotiating and drafting history and the postratification understanding of the contracting parties' " as aids in interpretation. *Id.* at 167–168, 119 S.Ct. 662, *quoting Saks*, 470 U.S. at 399, 105 S.Ct. 1338, and *Zicherman v. Korean Air Lines Co.*, 516 U.S. 217, 226, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996).

The Court began with the language of Article 24, " '(2) Dans les cas prevus a l'article 17,' " which literally translated, means " *'the cases anticipated by Article 17,' '* or " *'the cases provided for by Article 17.' '* " *Id.* at 168 & n. 11, 119 S.Ct. 662 (emphasis added), quoting *The New Cassell's French Dictionary* 132, 593 (D.Gir-

---

6. Similarly, in *Air France v. Saks*, 470 U.S. 392, 408, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985), the Supreme Court had reserved decision on whether a passenger whose injury was not caused by an "accident" and who could not recover under the Convention could nevertheless maintain a state law cause of action for negligence.

7. The Court assumed first, that the search of Tseng was not an "accident," because the parties had not placed that fact in issue. 525 U.S. at 166, 119 S.Ct. 662. In addition, although Tseng had urged in the lower courts

that her injuries were caused by "wilful misconduct" under Article 25 of the Convention and consequently the Convention's limitations on liability did not apply, Tseng did not raise that issue before the Supreme Court. *Id.* at 166–167 & n. 10, 119 S.Ct. 662. The district court found no basis to infer wilful misconduct, and the Court of Appeals did not disturb that finding. *Id.* at 167, n. 10, 119 S.Ct. 662. The Court accordingly assumed no Article 25 issue was present. *Id.* at 166–167, 119 S.Ct. 662.

ard. ed.1973), and *The Oxford–Hachette French Dictionary* 645 (M. Correard & V. Grundy eds.1994). The Second Circuit interpreted "les cas prevus a l'article 17" to mean cases in which a passenger may actually *recover* under Article 17, which would exclude cases in which a passenger could not recover from the proscription against pursuit of claims under local law. *Id.* at 168, 119 S.Ct. 662. The Supreme Court determined that the better interpretation of the phrase was that urged by El Al: "all personal injury cases stemming from occurrences on board an aircraft or in embarking or disembarking." *Id.*[8]

The Court rested this determination partially upon the purpose of the Convention, which was to " 'achiev[e] uniformity of rules governing claims arising from international air transportation.' " *Id.* at 169, 119 S.Ct. 662, quoting *Floyd*, 499 U.S. at 552, 111 S.Ct. 1489. The treaty's preamble states that the signatories " 'recognized the advantage of regulating in a uniform manner the conditions of . . . the liability of the carrier.' " *Id.*, quoting 49 Stat. at 3014. After reviewing three types of liability for carriers in defined in Articles 17–19 and the conditions of liability delineated in Articles 20, 22, 23 and 25, the Court concluded:

> Given the Convention's *comprehensive scheme of liability rules and its textual emphasis on uniformity,* we would be hard put to conclude that the delegates at Warsaw meant to subject air carriers to the distinct, nonuniform liability rules of the individual nations.

*Id.* The Supreme Court explained that the Second Circuit had misconstrued the Supreme Court's holding in *Zicherman v. Korean Air Lines Co.,* 516 U.S. 217, 116 S.Ct. 629, 133 L.Ed.2d 596 (1996). In *Zicherman,* the Court concluded that the drafters of the Convention had intended to resolve whether there is liability but left the issue of the determination of compensatory damages to the law of the forum under its choice of law rules. 516 U.S. at 231, 116 S.Ct. 629. The *Tseng* Court explained that the Second Circuit had misunderstood *Zicherman* to stand for the broader proposition that the Convention does not express a "compelling interest in uniformity that would warrant preempting an otherwise applicable body of law." *Tseng,* 525 U.S. at 169, 119 S.Ct. 662, citing *Tseng,* 122 F.3d at 107. Furthermore, the Supreme Court declared, the Convention also had a "complementary purpose . . . to accommodate or balance the interests of passengers seeking recovery for personal injuries, and the interests of air carriers seeking to limit potential liability." *Id.* at 170, 119 S.Ct. 662. According to the Supreme Court's reading of the drafting history, the drafters struck a compromise between these interests by limiting the *types* of claims passengers can bring against carriers and the amount of damages recoverable, while at the same time preventing carriers from contractually excluding or limiting their liability for personal injury. *Id.* at 170–171, 119 S.Ct. 662. With this understanding of the Convention's purpose, the Supreme Court concluded that several "anomalies" would be produced by allowing recovery under local

---

**8.** The United States government, as *amicus curiae,* supported this interpretation. The Supreme Court noted that "respect is ordinarily due the reasonable views of the Executive Branch concerning the meaning of an international treaty," because that agency is charged with negotiation and enforcement of a treaty. *Id.* at 168, 119 S.Ct. 662, citing

*Sumitomo Shoji America, Inc. v. Avagliano,* 457 U.S. 176, 184–85, 102 S.Ct. 2374, 72 L.Ed.2d 765 (1982). The Supreme Court agreed with the government's interpretation because it was "most faithful to the Convention's text, purpose, and overall structure." *Id.* at 168–169, 119 S.Ct. 662.

law when the Convention does not allow recovery: For example, passengers who are physically injured could seek recovery under the Convention, while others who suffer only trauma but no physical injury could recover under local tort theories, and thereby encourage "artful pleading" to opt out of the liability scheme provided in the Convention. *Id.* at 171, 119 S.Ct. 662. "Such a reading," the Court declared, "would scarcely advance the predictability that adherence to the treaty has achieved worldwide." *Id.*

Accordingly, the Court disagreed with the Second Circuit's concern that those injured inside an airport, for example, would be barred from any recovery against an airline, because the Convention extends only to occurrences during flight or during embarking or disembarking. Id. at 171–172, 119 S.Ct. 662. The Court emphasized,

> "[T]he Convention's preemptive effect on local law extends no further than the Convention's own substantive scope." ... A carrier, therefore, "is indisputably subject to liability under local law for injuries arising outside of that scope: *e.g.*, for passenger injuries occurring before any of the operations of embarking or disembarking."

*Id.* (internal quotation marks and citation omitted), quoting Brief for the United States as Amicus Curiae, at 16. The Court further dismissed plaintiff's concern that air carriers would largely escape liability, reasoning that the term "accident" is an " 'unusual event ... *external to the passenger,*' and that 'this definition should be flexibly applied.' " *Id.* (emphasis added in original), quoting *Saks,* 470 U.S. at 405, 105 S.Ct. 1338.

Furthermore, the Court rejected the Second Circuit's conclusion that national law should govern when the convention does not apply. The Court of Appeals had relied upon the withdrawal of a Czecho-slovak proposal to provide that in the absence of a provision in the treaty, " 'the provisions of laws and national rules relative to carriage in each [signatory] State shall apply.' " *Id.* at 173, 119 S.Ct. 662, quoting *Tseng,* 122 F.3d at 105 (quoting *Second Int'l Conference on Private Aeronautical Law, Oct. 4–12, 1929, Warsaw, Minutes* 176 (R. Horner & D. Legrez transls.1975)). That proposal had been withdrawn and the title of the treaty amended to describe the treaty as relating only to *"Certain"* rules regarding international transportation. *Id.* (emphasis added), citing 122 F.3d at 105. The Supreme Court referred to a British opinion by the House of Lords which considered that history but found it inconclusive. That case, *Sidhu v. British Airways plc,* [1997] 1 All E.R. 193, stated that the inclusion of the word "certain" indicates that " 'the [C]onvention is concerned with certain rules only, not with all the rules relating to international carriage by air.' " *Id.,* citing *Sidhu,* 1 All E.R. at 204.

> For example, the convention does not say "anything ... about the carrier's obligations of insurance, and in particular about compulsory insurance against third party risks." ... The Convention, in other words, is "a partial harmonisation, *directed to the particular issues with which it deals,"* ... *among them, a carrier's liability to passengers for personal injury. As to those issues, the Lords concluded, "the aim of the "[C]onvention is to unify."* Pointing to the overall understanding that the Convention's objective was to "ensure uniformity," ... the Lords suggested that the Czechoslovak delegation may have meant only to underscore that national law controlled "chapters of law relating to international carriage by air with which the [C]onvention was not attempting to deal." In light of the Lords' exposition, we are satisfied that the

withdrawn Czechoslovak proposal will not bear the weight the Court of Appeals placed on it. *Id.* at 173–174, 119 S.Ct. 662 (emphasis added), quoting *Sidhu,* 1 All E.R. at 204–209. Moreover, *Sidhu* came to the same conclusion the Supreme Court reached in *Tseng:* The Lords determined that the "Convention was designed to 'ensure that, *in all questions relating to the carrier's liability,* it is the provisions of the [C]onvention which apply and that the passenger does not have access to any other remedies, whether under the common law or otherwise, which may be available within in the particular country where he chooses to raise his action.'" *Id.* (emphasis added), quoting *Sidhu,* 1 All E.R. at 201, 207.[9]

Finally, the Supreme Court looked to the language of Montreal Protocol No. 4, which, as stated, amends Article 24 to state: "'In the carriage of passengers and baggage, *any action for damages, however founded, can only be brought subject to the conditions and limits set out in this Convention....*'" *Id.* at 174, 119 S.Ct. 662, quoting S. Exec. Rep. No. 105–20, at 29 (emphasis added). Although not yet effective in the United States at the time of the Court's decision, the Court found that the language of the Protocol "merely clarifies, [but] does not alter, the Convention's rule of exclusivity." *Id.* at 174–175, 119 S.Ct. 662. The Court disagreed with plaintiff's contention that the amendment should be considered to alter the meaning of Article 24, because federal preemption of state law is generally disfavored. *Id.* at 175, 119 S.Ct. 662. The Court reasoned, "Tseng overlooks in this regard that the nation-state, not subdivisions within one nation, is the focus of the Convention and the perspective of our treaty partners. Our home-centered preemption analysis, therefore, should not be applied, mechanically, in construing our international obligations." *Id.*

The Court's analysis in *Tseng* leads this Court to conclude that the Convention was likely intended to preempt all local causes of action, including federal causes of action, to the extent those actions seek damages against a carrier. *Tseng*'s determination that the amendment to Article 24 does not change the scope of the Convention, but instead merely clarifies it, makes it clear that all actions for damages, however styled, are preempted. 525 U.S. at 174–75, 119 S.Ct. 662. However, as plaintiffs point out, plaintiff does not seek merely damages for his federal discrimination claims; he seeks declaratory and injunctive relief as well.

Only two cases have discussed whether claims such as federal discrimination claims are preempted by *Tseng*'s reasoning. In *Brandt v. American Airlines,* No. C 98–2089, 2000 WL 288393 (N.D.Cal. March 13, 2000), a California district court held that in the wake of *Tseng,* a plaintiff's claims under the Air Carrier Access Act for discrimination were preempted by the Convention. The Court observed:

There appears to be no authority governing whether federal discrimination claims, as opposed to state tort claims, do or do not fall within the scope of the Convention's causes of action for bodily injury, death, delay or destruction of goods. The Court recognizes that federal discrimination claims may be distinguished from other personal injury claims. For example, federal discrimination rights are often founded on statutory law, rather than general common law theories. Moreover, the United

---

9. *Tseng* commented that similarly, several other courts from "sister signatories" reached the same conclusion, including courts in Brit-

ish Columbia, Ontario, New Zealand, and Singapore. *See id.* at 176 & n. 16, 119 S.Ct. 662 (collecting cases).

States maintains a strong policy interest in favor of protecting persons within its borders from discriminatory treatment.... However, the United States Supreme Court has recognized that the *Convention's primary purpose was to secure "uniformity of rules governing claims arising from international air transportation."* ... Allowing air carrier exposure to discrimination claims which do not conform to the requirements of the Convention *would undercut the signatory nations' desire for uniformity and "the Convention's comprehensive scheme of liability," subjecting them to "unlimited liability under diverse legal regimes."* ...

*Id.* at *4 (emphasis added) (footnote and citations omitted). More recently, in *Turturro v. Continental Airlines,* 128 F.Supp.2d 170, 180 (S.D.N.Y.2001), a New York district court held that the ACAA is included in the "local law" preempted by the Convention and found a plaintiff's ACAA claims against Continental, a domestic airline, preempted. *Turturro* noted that although Congress had recently amended the ACAA to add "foreign air carrier[s]" to its purview, it did so "subject to [49 U.S.C.] § 40105(b)," which states that the executive branch "shall act consistently with obligations of the United States Government under an international agreement." 128 F.Supp.2d at 180, *quoting* Wendell H. Ford Aviation Investment and Reform Act for the 21st Century (Apr. 5, 2000), Pub.L. No. 106–181, 114 Stat. 61 (codified at 49 U.S.C. § 41705(a) (Supp. Sept. 2000)). Because of that express condition, the court found Congress had manifested its intent that the later statute not preempt the Convention. *See id.,* citing *Trans World Airlines, Inc. v. Franklin Mint Corp.,* 466 U.S. 243, 252, 104 S.Ct. 1776, 80 L.Ed.2d 273 ("A treaty 'will not be deemed to have been abrogated or modified by a later statute unless such

purpose on the part of Congress had been clearly expressed.' "). The *Turturro* court further disagreed with plaintiff's argument that such statutes should not be preempted because such would enable domestic airlines to escape punishment for "egregious acts of discrimination on their international flights." *Id.* at 180. That Court stated that an act of discrimination might under certain circumstances constitute an "accident" under the Convention, in which case the airline would not escape liability. *Id.* at 180–81.

> Moreover, the Convention massively curtails damage awards for victims of horrible acts such as terrorism; the fact that the Convention also abridges recovery for the lesser offense of discrimination should not surprise anyone.

*Id.* at 181. Thus, *Tseng* and the courts which have addressed whether its teachings apply to federal discrimination claims focus on the Convention's goal of providing comprehensive scheme of liability to ensure predictability to signatories, and the goal of generally restricting the types of actions for damages which may be brought to ensure uniformity.

Here, plaintiff seeks to recover damages for alleged injuries sustained as a result of what he claims were acts of discrimination by the defendants. Although his cause of action is grounded in discrimination statutes, the thrust of his claim is one of personal injury. Undoubtedly, this falls within the scope of the Convention and the goal of providing a uniform scheme of liability. Although *Turturro*'s discussion of the amendments relied upon the extension of the ACAA to foreign air carriers, *Turturro* itself was an action against Continental, a domestic airline, and thus its discussion was likely intended to highlight Congress' recognition that the statute generally might be preempted by the Convention. *Turturro*'s conclusion that the

Convention would be undercut by the application of diverse regimes applies with equal force to plaintiff's claims under ACAA against Alitalia (Count V) and against Continental (Counts IV, VI–VIII). The reasoning also applies equally to plaintiff's FAA claims (Counts II–III). Because the Court agrees with *Brandt* and *Turturro* that the purposes of the Convention would be undercut by allowing plaintiff to pursue a cause of action that falls within the scope of the Convention, the Court finds that plaintiff's ACAA and FAA claims are preempted. Summary judgment is granted on Counts II–VIII.

### III. Plaintiff's Federal Discrimination Claims

Even if plaintiff's federal discrimination claims were not preempted by the Warsaw Convention's exclusivity principle, the Court finds that summary judgment to defendants is required because plaintiff would be unable to recover under any of his asserted theories.

### A. Claims Under the Federal Aviation Act, 49 U.S.C. § 41310(a)

 Plaintiff asserts claims against both Continental Airlines and Alitalia under the Federal Aviation Act, 49 U.S.C. § 41310(a) (Counts II–III).[10] That section provides:

> An air carrier or foreign air carrier may not subject a person, place, port, or type of traffic in foreign air transportation to unreasonable discrimination.

49 U.S.C. § 41310(a). This provision replaced the former Section 404(b) of the Federal Aviation Act, 49 U.S.C. app § 1374(b), which prohibited discrimination in air transportation. The Airline Deregulation Act, Pub.L. 95–504, 92 Stat. 1705, repealed all of § 404(b) except for one

provision which required air carriers to provide "safe and adequate service." *See Puckett v. Northwest Airlines, Inc.*, 131 F.Supp.2d 379, 383 (E.D.N.Y.2001). At the outset, it is not entirely clear to this Court whether a private right of action lies under Section 41310(a). Although a number of courts had previously implied a private right of action in the old version of the statute, *see Wolgel v. Mexicana Airlines*, 821 F.2d 442, 443 (7th Cir.1987), *cert. denied*, 484 U.S. 927, 108 S.Ct. 291, 98 L.Ed.2d 251 (1987); *Hingson v. Pacific Southwest Airlines*, 743 F.2d 1408, 1412 (9th Cir.1984) (court implied private right of action for discriminatory boarding and seating practices); *Polansky v. Trans World Airlines, Inc.*, 523 F.2d 332 (3d Cir.1975) (recognizing that private right of action may exist for discriminatory practices but not necessarily for "bumping," as the statutory purpose o Section 1374(b) included to provide free access to air facilities and promotion of "efficient service by air carriers ... without unjust discrimination[ ]"), this Court has not located any cases which has implied a private right of action in the new provision of Section 41310(a). In *Puckett*, a Pennsylvania district court dismissed a plaintiff's claims for discrimination under Section 1374(b), noting that this provision was repealed in 1983, and that "a private right of action may not lie to enforce a non-existent statute." 131 F.Supp.2d at 383. However, it made no mention of the availability of relief under the new Section 41310. It does not appear that the *Puckett* parties addressed the issue of availability of relief under Section 41310. In *Fields v. BWIA Int'l Airways Ltd.*, No. 99 CV 2493, 2000 WL 1091129, at *4 (E.D.N.Y. July 7, 2000), a federal district court in New York was

---

10. Plaintiff has not asserted federal discrimination claims against defendants Tyburski or the Port Authority.

similarly presented with a claim under Section 1374(b). That court dismissed plaintiff's discrimination claim under Section 1374(b) because Congress had repealed that section in 1983. The court noted that Section 41310 prohibits foreign and domestic air carriers from discrimination but that plaintiff had not requested the court to imply a private right of action. Accordingly, the court found that section inapplicable to plaintiff's discrimination claims. *Id.* at *4 & n. 5. In *Ratnaswamy v. Air Afrique,* No. 95 C 7670, 1998 WL 111652, *5 (N.D.Ill. Mar.3, 1998), another district court declined to decide whether Section 41310 creates a private right of action for passengers who allege discrimination, because it did not consider the plaintiffs' "bumping" claim to include a claim of discrimination.

In the absence of any clear authority, the Court finds it is appropriate to rely upon the earlier cases which addressed whether a private right of action existed under the old Section 1374(b). A number of those cases found that under the standards set forth in *Cort v. Ash,* 422 U.S. 66, 95 S.Ct. 2080, 45 L.Ed.2d 26 (1975), the FAA had intended to provide a private right of action for discrimination. *See Wolgel,* 821 F.2d at 443; *Hingson,* 743 F.2d at 1412; *Polansky v. Trans World Airlines, Inc.,* 523 F.2d at 335.

Under *Cort,* a court must consider several factors in determining whether to imply a private right of action:

First, whether the statute was designed to protect a class of persons into which plaintiff falls from the harm plaintiff has suffered; Second, whether there is any indication of legislative intent to create or deny a private remedy; Third, whether implication of a private remedy would be consistent with the purposes of the legislative scheme; and Fourth, whether the cause of action is one traditionally relegated to state law such that inference of a federal cause of action would be inappropriate.

*Polansky,* 523 F.2d at 334. In *Polansky,* the court recognized that a private right of action might be implied for discrimination under the old Section 1374(b). The court reasoned that the purpose of the statute was "to protect the right of Access to air facilities from discriminatory interference by the air carrier. The airlines is required to treat all potential passengers and users equally. This, the airline may not prohibit minority groups from equal access to flights or terminal facilities." *Id.* at 335–36. However, the court refused to imply a private right of action for "bumping," which constituted a mere breach of contract:

Appellant seems to argue that the statutory prohibition against "prejudice" and "disadvantage" includes a contract breached by inadequate presentation of services.... Something more than mere breach of contract must be shown. In our view that something more must be *a showing that the breach was the result of Discrimination by the airline and that the breach had the effect of denying Access to air facilities.*

*See id.* at 336 n. 13.

This suggests that if the Court implies a private right of action, then it must do so only for a claim that a discrimintory action by the airline led to plaintiff's denial of his bulkhead seat or the alleged failure to provide adequate transfer services. It is unclear precisely what the elements of such a claim might be, but common sense dictates that there be some causal connection between plaintiff's disability and the airline's alleged discriminatory conduct. The Court has located only one case which addresses the merits of a claim of discrimination under former Section 1374(b) under the FAA, *Hingson v. Pacific Southwest*

*Airlines,* 743 F.2d 1408 (9th Cir.1984). *Hingson* does not assist the Court to determine the required elements of a cause of action under the FAA because there, the airline had insisted that the handicapped passenger, who was blind, occupy a bulkhead seat because he was blind and he traveled with a guide dog. *Id.* at 1411. Plaintiff was escorted off the aircraft when he refused to take a bulkhead seat, and filed suit in federal court claiming that the airlines actions constituted unlawful discrimination under Section 404(b) of the FAA, 49 U.S.C. § 1374(b). *Id.* Although on appeal, the issue presented was whether certain expert testimony should have been admitted, the court commented that the "parties agree that the basic issue in this case is whether PSA acted unreasonably in demanding that Hingson take a bulkhead seat." *Id.* at 1413. While that might suggest that the issue in the present case similarly is whether Alitalia was unreasonable in denying plaintiff a bulkhead seat, that is not necessarily so because in *Hingson* it was undisputed that the seat assignment was because of the plaintiff's disability, whereas here, there is no evidence of whether the decision was made *because* of plaintiff's disability.

If this Court is to find that such reasoning applies to the new version of the statute codified at 49 U.S.C. § 41310(a), then, there must be more than a mere allegation of inadequacy of services presented by the carrier. Instead, if this court were to imply a private right of action, it would do so only if there were some allegation that plaintiff was denied a bulkhead seat or provided inadequate transfer services because of his disability, not merely a mistake or some other error. Here, however, plaintiff has neither alleged nor adduced any evidence of any intentional discrimination on the part of Alitalia (or Continental for that matter).[11] Even if there were a private right of action under Section 41310(a), and it were not preempted by the Warsaw Convention, this Court could not allow such a claim to go to the jury, and summary judgment would be granted for this independent reason as to Counts II and III.

## B. Claims Under the Air Carrier Access Act, 49 U.S.C. § 41705

The Air Carrier Access Act states:

In providing air transportation, an air carrier, *including (subject to section 40105(b)) any foreign air carrier, may not discriminate against an otherwise qualified individual* on the following grounds:

(1) the individual has a physical or mental impairment that substantially limits one or more major life activities.

(2) the individual has a record of such an impairment.

(3) the individual is regarded as having such an impairment.

49 U.S.C. § 41705(a) (emphasis added). Unlike the ambiguous history of the Aviation Act, a number of courts have implied a private right of action in this provision, formerly 49 U.S.C. app. § 1374(c). *See Adiutori v. Sky Harbor Int'l Airport,* No. 95–15774, 103 F.3d 137, 1996 WL 673805 (9th Cir. Nov.20, 1996); *Shinault v. American Airlines,* 936 F.2d 796, 800 (5th Cir. 1991); *Tallarico v. Trans World Airlines,* 881 F.2d 566, 570 (8th Cir.1989). However, the *Shinault* Court implied only a right of action to seek damages, not injunctive relief, because "the Department of Trans-

---

**11.** Moreover, as discussed in the section below, plaintiff has proffered no evidence to show that Continental may be liable for any of Alitalia's alleged actions by virtue of a contractual or other relationship, and the FAA claim against Continental iN Count III must be dismissed for this independent reason.

portation secures prospective relief through administrative remedies." 936 F.2d at 804.

This statute was amended in 2000 by the Wendell H. Ford Aviation Investment and Reform Act for the 21st Century ("AIR21" or "Reform Act"), Pub.L. 106–181 (April 5, 2000). AIR21 struck the phrase "carrier" and inserted in its place "carrier, including (subject to section 40105(b)) any foreign air carrier." Pub.L. 106–181, Section 707(a)(2).

Before the amendment, the section applied only to domestic air carriers. By its terms, then, ACAA did not apply to foreign air carriers until the effective date of the amendment, which according to the text of Pub.L. 106–181 is any fiscal year after September 30, 1999. Pub.L. 106–181, Section 3, set forth as note to 49 U.S.C. § 106. As plaintiff's cause of action arose in 1998, plaintiff can bring no claim against Alitalia unless the amendment was intended to apply retroactively.

■ Ordinarily, "statutes affecting substantive rights and liabilities are presumed to have prospective effect.'" *Bennett v. New Jersey*, 470 U.S. 632, 639, 105 S.Ct. 1555, 1560, 84 L.Ed.2d 572 (1985); *Davis v. Omitowoju*, 883 F.2d 1155, 1170 (3d Cir.1989); *Tyree v. Riley*, 783 F.Supp. 877 (D.N.J.1992); *Thomas v. Frank*, 791 F.Supp. 470 (D.N.J.1992); *see also Anderson v. USAir, Inc.*, 818 F.2d 49, 53 (D.C.Cir.1987) (holding original ACAA did not apply retroactively). This "venerable rule of statutory construction" also applies · to amendments to existing statutes. *Bennett*, 470 U.S. at 639, 105 S.Ct. at 1560.

■ Because the 2000 amendments to the ACAA under AIR21 create new liabilities for foreign air carriers which previously did not exist, it would be inappropriate to apply the amendment retroactively unless there was an explicit contrary intent manifested by Congress. Here, however, Congress has made its intent clear: the note in Section 3, of Pub.L. 106–181 states: "Except as otherwise specifically provided, *this Act and the amendments made by this Act shall apply only to fiscal years beginning after September 30, 1999.*" 49 U.S.C. § 106, note. Only one case has been located which discusses whether the amendments should apply retroactively. In *Alino v. Aerovias de Mexico, S.A.*, 129 F.Supp.2d 1341, 1344 (S.D.Fl.2000), the district court applied the amendments to actions that took place on January 3, 2000. Although such might technically be considered a "retroactive" application, that Court found Congress' intent determinative of the question, and found it appropriate to apply the amendments to actions that fell within a fiscal year that began after September 30, 1999. 129 F.Supp.2d at 1344. Here, the complained-of conduct occurred in December 1997 and January 1998, well before the AIR21 amendments took effect. This Court cannot apply Section 41705, as amended, retroactively to a foreign carrier, Alitalia. Accordingly summary judgment must be granted to defendant Alitalia on Count V (whether the statute is preempted by the Warsaw Convention or not).

■ The remaining Counts are asserted against Continental only. These claims include allegations that Continental violated (1) the Air Carrier Access Act, 49 U.S.C. § 41705 (Count IV); (2) 14 C.F.R. § 382.7 (Count VI); (3) 14 C.F.R. § 382.9 (Count VII); and 14 C.F.R. § 382.61. Plaintiff also asserts a claim for punitive damages against Continental in Count X.

Section 382.7 of the regulations states:

(a) *A carrier shall not, directly or through contractual, licensing, or other arrangements:*

(1) Discriminate against any otherwise qualified individual with a disability,

*by reason of such disability,* in the provision of air transportation; ...

(3) *Exclude a qualified individual with a disability from or deny the person the benefit of any air transportation or related services that are available to other persons,* even if there are separate or different services available for handicapped persons except when specifically permitted by another section of this part....

14 C.F.R. § 382.7. The parties do not dispute that plaintiff is an "otherwise qualified individual with a disability" within the meaning of the regulation. *See* 14 C.F.R. § 382.5. Section 382.9 provides:

Carriers' contracts with contractors who provide services to passengers, including carriers' agreements of appointment with travel agents ... shall include a clause assuring

(a) Nondiscrimination on the basis of disability, consistent with this part, by such contractors in activities performed on behalf of the carriers; and

(b) That contractor employers will comply with directives issued by carrier complaints resolution officials (CROs) under Section 382.67.

14 C.F.R. § 283.9. Section 382.61(a)(6) provides:

Each carrier shall provide, or require its contractors to provide, training to the contractors' employees concerning travel by handicapped persons. This training is required only for those contractor employees who deal directly with the traveling public at airports, and it shall be tailored to the employees' functions. Training for contractor employees shall meet the requirements of paragraphs (a)(1) through (a)(5) of this section.

14 C.F.R. § 382.61(a)(6). "Air Carrier" is defined as "any citizen of the United States who undertakes, whether directly or indirectly or by a lease or any other arrangement, to engage in air transportation." 14 C.F.R. § 283.5. "Indirect air carrier" is defined as "a person not directly involved in the operation of an aircraft who sells air transportation services to the general public other than as an authorized agent of an air carrier." *Id.*

As described by plaintiff, 14 C.F.R. §§ 382.7, 382.9 and 382.61 were promulgated by the DOT to implement the ACAA. Plaintiff Alleges that these provisions were violated by Continental "when Alitalia, its agent, contractor, and Code–Share Partner discriminated [against] Mr. Waters, a qualified individual with a disability." Compl. at ¶ 82. Plaintiff alleges that Continental violated Section 382.9 because it "failed to assure that Alitalia, its agent, contractor and Code–Share Partner did not discriminate 'on the basis of disability' when providing services to code-share partners." Compl. at ¶ 87. Finally, Plaintiff asserts that Continental violated Section 382.61 because it "failed to ensure that employees of Alitalia, its agent, contractor and Code–Share Partner, were trained to provide services to passengers with disabilities in conformity with the objectives and procedures identified in 14 C.F.R. Part 382." Compl. at ¶ 92.

Defendants argue that plaintiff has failed to state a claim under any Count against Continental, because although plaintiff assumes that Continental operated Flights 610 and 611 as a "code-share partner" with Alitalia, Continental does not operate any code share flights with Alitalia to or from JFK. Deft. Br. at 19. Defendants argue: "Given that it is undisputed that Continental had no involvement whatsoever in the operation of the subject flight, including plaintiff's seating assignment or provision of meet and assist services, dismissal of all claims against Continental is warranted as a matter of law." *Id.* The only opposition to this contention

plaintiff provides is a conclusory assertion that the nature and terms of the contractual agreements between Alitalia and Continental has not been fully disclosed, which raises issues of fact for trial. However, discovery is closed, and plaintiff has failed to rebut the evidence that the only relationship between Continental and Alitalia with regard to plaintiff's flights was that Alitalia allowed plaintiff to redeem his sister's Continental One–Pass miles, which led to the issuance of a Continental ticket for a flight operated solely by Alitalia. There is no evidence in the record that Continental was involved "indirectly" through any contractual arrangement in the operation of either of plaintiff's flights or that it was involved indirectly in the provision of the meet and assist services to plaintiff by Alitalia. And plaintiff's bare conclusory statements and speculation is insufficient to defeat summary judgment. Even if plaintiff's ACAA claims against Continental were not preempted, summary judgment would be granted as to Counts IV and VI–VIII.

## IV. Application of Warsaw Convention to Plaintiff's Claims

■ Defendants argue that plaintiff may not recover under the Warsaw Convention because his alleged injury was not caused by an "accident" as defined by the Convention, and because plaintiff did not suffer "bodily injury" as required by the Convention. The Supreme Court held in *Air France v. Saks* that to recover under the Convention, a passenger's injury must be caused by some identifiable event that is unusual or unexpected and external to the passenger. 470 U.S. 392, 395, 105 S.Ct. 1338, 84 L.Ed.2d 289 (1985). In *Saks,* the Supreme Court held that a plaintiff could not recover for her alleged injury of hearing loss that was a result of her own internal reaction to the normal cabin pressurization changes during landing.

*Id.* at 396, 105 S.Ct. 1338. In *Grimes v. Northwest Airlines, Inc.,* No. CIV. A. 98–CV–4794, 1999 WL 562244 (E.D.Pa. July 30, 1999), *aff'd,* 216 F.3d 1076 (3d Cir.), *cert. denied,* 531 U.S. 879, 121 S.Ct. 190, 148 L.Ed.2d 132 (2000), the plaintiff had requested an exit row seat and took the seat he thought had been assigned to him. Another passenger held a boarding pass for the same seat and requested assistance from a flight attendant when she found the plaintiff sitting in her seat. When the plaintiff refused to move, a dispute arose between the plaintiff and the flight attendant, which resulted in plaintiff's ejection from the flight. *Id.* at *2. During the argument, plaintiff claimed that the attendant had "brushed against [plaintiff] with his crotch." *Id.* at *1. Plaintiff claimed that he suffered a variety of physical injuries during his confrontation and ultimate arrest by airport police. The Court explained that in order to determine whether an accident occurred, the court must consider "all of the circumstances that surrounded the passenger's injuries." *Id.* at *3, citing *Saks,* 470 U.S. at 405, 105 S.Ct. 1338. Furthermore,

> [t]he passenger is required to show only that one link in the chain of events leading to his injury was unexpected or unusual to prove an accident has occurred.... This one link, however, must relate to the cause of the incident, not merely to the occurrence itself.... Where the Court is confronted with contradictory evidence, it should defer to the jury whether an "accident" occurred.

*Id.* at *3 (citations omitted). The *Grimes* court concluded that neither the disagreement over plaintiff's seat nor his removal from the plane by airport police constituted an "accident":

> An *argument over seating is neither unexpected nor unusual, particularly in view of [plaintiff's] admissions that he*

*refused to move to another seat,* as [the flight attendant] instructed, and that he responded to [the attendant's] instructions with unfavorable comments regarding [his] appearance.

*Id.* (emphasis added). Moreover, the Court found that plaintiff's alleged injuries were not the result of an accident because he suffered those alleged injuries "only because he refused to leave the plane voluntarily. He never would have been handcuffed and taken off the plane had he left when ordered by the plane's captain." *Id.* Because the plaintiff's decision interrupted any possible causal connection that the captain's decision to eject plaintiff had with his alleged injuries:

> Under *Saks* the Court is required to look at the circumstances surrounding the incident, and [plaintiff's] behavior and decisions plainly are among the factors the Court must consider. [Plaintiff] himself held the key as to whether he would be arrested. He declined to be compliant; he refused to leave voluntarily. Having precipitated this result, neither the Warsaw Convention nor equity permit him to recover from Defendant.

*Id.* In *Brandt v. American Airlines,* plaintiff had requested food be brought to him in order to take medication for his myasthenia gravis, an illness that causes muscle weakness. No. C 98–2089, 2000 WL 288393, *1 (N.D.Cal. March 13, 2000). Plaintiff was denied his request for food because it was a beverage only flight. *Id.* When he stood up to relieve cramps in his legs, he was pushed down into his seat by a flight attendant who was clearing the aisle while providing medical assistance to another passenger. *Id.* at *2–3. Plaintiff was forced to deplane after a dispute with the attendant and the airline made a public announcement that "the passengers who had caused the delay were now getting off," prompting other passengers to sneer

at the plaintiff. *Id.* at *3. The court found that no accident had occurred as "it is not 'unexpected or unusual' that a flight attendant might physically touch a passenger in order to ensure that the passenger is seated or in order to clear the aisle." *Id.* at *7. The court also stated that asking a passenger to deplane for refusing to obey flight attendant's orders or the announcement concerning the resolution of the delay were not "unusual occurrences in the course of air travel" and did not constitute an "accident." *Id.* Moreover, the court found that his alleged aggravation of his medical condition was not an unusual event but rather was plaintiff's "personal 'reaction to the usual normal, and expected' fact that defendant's beverage-only flight did not offer food service for passengers." *Id.* at *8, quoting *Saks,* 470 U.S. at 406, 105 S.Ct. 1338.

Similarly, assignment of seats to passengers and disputes over them are commonplace and do not constitute an accident. Whether plaintiff refused to transfer to his assigned seat, as defendants argue, or whether the two uniformed attendants were unable to transfer him to the seat, as plaintiff contends, neither of these incidents are unusual or unexpected. Moreover, plaintiff admits that he refused to sit in the seat where he was ultimately wheeled, regardless of whether he believed that to be his correct seat and regardless of his protestation that the two unidentified agents were unable to transfer him. Plaintiff has established that he was able to transfer with the help of his family members. Under these circumstances, the Court finds that plaintiff's fate was in his hands. As with the plaintiff in *Grimes,* plaintiff's refusal to sit in his assigned seat eliminated any possible causal link between the seating assignment and plaintiff's alleged injuries. The injuries plaintiff claims to have experienced result from his own "internal reaction" to not

being assigned a bulkhead seat despite his special request and from his refusal to take his assigned seat despite Alitalia's request that he do so. Moreover, being bumped by other passengers and/or their luggage as they passed by plaintiff while he was in the aisle in the transfer chair was also neither unexpected nor unusual event, especially in view of the evidence that plaintiff refused to allow himself to be transferred to his assigned seat when he discovered that it was not a bulkhead seat. The Court finds that plaintiff has failed to establish that an "accident" occurred on board either Flight 611 or 610 (his return trip), and plaintiff may not recover under the Convention.

Furthermore, defendants argue that even if an accident occurred within the meaning of the Convention, plaintiff did not suffer "physical injury" as required by the Convention. The Warsaw Convention does not allow recovery for emotional injuries that are unaccompanied by physical injuries. *See Floyd*, 499 U.S. at 552, 111 S.Ct. at 1502 (headaches, nausea, panic attacks, trembling and palpitations caused by emotional distress do not qualify as physical injury under the Convention); *Terrafranca v. Virgin Atlantic Airways*, 151 F.3d 108, 109–110 (3d Cir.1998) (post traumatic stress disorder, anxiety, fear of flying and weight loss were not recoverable injuries under the Warsaw Convention); *Fields v. BWIA Int'l Airways Ltd.*, No. 99–CV–2493, 2000 WL 1091129, *6 (E.D.N.Y. July 7, 2000) (no recovery for emotional injuries regardless of allegation

of wilful misconduct); *Brandt*, No. C 98–2089, 2000 WL 288393, *8 (N.D.Cal. March 13, 2000). (airlines are not liable for emotional or psychological injuries that are unaccompanied by physical injury under the Convention); *Grimes*, 1999 WL 562244, at *2 (plaintiff's spouse could not recover for purely emotional injuries). As discussed, plaintiff contends he suffered emotional anguish, along with weight loss, constipation, sleeplessness, and an exacerbation of some of his multiple sclerosis symptoms, in that his upper body became weaker. However, plaintiff submits no evidence that any of his physical complaints, particularly his worsened MS symptoms, were caused by the incident on the plane. Nevertheless, because the Court concludes that no accident occurred, it does not reach the question of whether plaintiff suffered the requisite "bodily injury" necessary to recover under the Convention. Plaintiff's claims for physical injuries, however styled, are dismissed.[12]

Because the Court has dismissed all claims asserted against each defendant, the Court also finds that it must dismiss Count X, the claim for punitive damages, and it does not need to reach plaintiff's additional argument that the Warsaw Convention precludes recovery of punitive damages.

### CONCLUSION

For the foregoing reasons, defendants' motion for summary judgment is granted.

**SO ORDERED.**

12. Plaintiff's counsel apparently chose not to address defendants' arguments in several points in their brief, including the issue of whether an accident had occurred or whether plaintiff suffered the requisite physical injury. Instead, plaintiff's counsel requested in a footnote permission to file a supplemental brief if the Court determines that the Warsaw Convention preempts plaintiff's federal causes of action. *See* Plaintiff Brief, at 18 n. 9. Plaintiff cites no rule that would allow such a procedure, and plaintiff's counsel did not request or receive permission from the Court to have the summary judgment motion ruled upon in such a piecemeal manner. Plaintiff's counsel should have included all necessary arguments in the opposition brief. The request is denied.

## ORDER

Defendants Alitalia Linee Aeree Italiane S.p.A. ("Alitalia"), Continental Airlines ("Continental"), Josephine Tyburski ("Tyburski"), and the Port Authority of New York and New Jersey ("PATH") (collectively, "defendants") move for summary judgment on all counts of the First Amended Complaint. Upon consideration of the parties' submissions, and for the reasons stated in the accompanying opinion,

It is on this ___ day of August, 2001:

ORDERED that defendants' motion for summary judgment is granted.